## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TYREE BOWIE, | : | Civil No. 1:24-CV-02105 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| KYLE HOWER, *et al.*, | : | |
| | : | |
| Defendants. | : | Judge Jennifer P. Wilson |

## MEMORANDUM

This lawsuit arises from the prosecution of Tyree Bowie ("Bowie") for the murder of two-year-old Dante Mullinix ("Dante"), which resulted in acquittal. Bowie alleges that certain Defendants instituted a malicious prosecution against him and that others fabricated evidence in the pursuit thereof. Defendants now move to dismiss Bowie's claims. For the reasons that follow, the court will grant Defendants' motions to dismiss.

### BACKGROUND

This description of facts is drawn from the materials the court may properly consider at this stage of litigation. Here, the universe of materials is limited to the "the allegations contained in the complaint, exhibits attached to the complaint[,] and matters of public record."[1] *Pension Benefit Guar. Corp v. White Consol.*

---

[1] Bowie asks the court to consider two hearing transcripts from his state prosecution, which are attached to one of his briefs. (Docs. 31-1 & 31-2.) With no objection from Defendants, the court will consider those documents in resolving the present motions. *Orndorf v. Fye*, No. 3:22-cv-00012, 2023 WL 4034449, at *2 (W.D. Pa. June 15, 2023) (quoting *In re Mechanicsburg*

*Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993).  The court does not consider allegations made for the first time in opposition briefs.  *See Katchur v. Thomas Jefferson Univ.*, 354 F. Supp. 3d 655, 662 n.3 (E.D. Pa. 2019) (citing *Pa. ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988)) ("[T]he Third Circuit has instructed that a court may not consider additional or contradictory facts alleged in an opposition brief when deciding a motion to dismiss.").

### A. Events Preceding Dante's Death

On September 6, 2018, Bowie spent the afternoon with Leah Mullinix ("Mullinix") and her son, Dante.  (Doc. 16, ¶ 11.)  The three mostly drove together around York, Pennsylvania, and spent time with Laci Peiffer ("Peiffer"), one of Bowie's friends.  (*Id.* ¶¶ 14–15.)  Around 8:00 p.m., Mullinix told Bowie that she was suffering a migraine and asked to be taken to a hospital for treatment.  (*Id.* ¶ 16.)  Bowie obliged and delivered Mullinix to York Hospital around 8:30 p.m.  (*Id.* ¶ 17.)  Dante remained with Bowie so that Mullinix could receive treatment without having to worry about Dante's care.  (*Id.* ¶ 18.)  Mullinix left Bowie with a diaper bag filled with supplies and food, including a bag of Teddy Grahams.  (*Id.* ¶¶ 19–20.)

---

*Fitness, Inc.*, 596 B.R. 24, 29 (Bankr. M.D. Pa. 2019)) ("Public records include criminal case dispositions, letter decisions of government agencies, published reports of administrative bodies, judicial opinions, and **hearing transcripts**.").

Neither Bowie nor Dante stayed with Mullinix at the hospital. (*See id.* ¶ 21.) Instead, they left to go to Peiffer's home. (*See id.*) Before traveling there, however, the two stopped at a Rutter's convenience store. (*Id.*) As Bowie was parking at Rutter's, "Dante went to the floor of the passenger side of the backseat" and began "acting strangely." (*Id.* ¶¶ 22, 123.) The complaint does not allege what caused Dante to go the floor or in what ways he was acting strangely. Nor does it allege whether or not Dante was in a child's car seat. Bowie walked around to the passenger-side rear window and observed Dante for about 15 seconds. (*Id.* ¶¶ 23, 118.) Eventually, Bowie and Dante, under his own power, walked together into the Rutter's. (Doc. 31-1, p. 8.)[2]

Bowie then drove with Dante to Peiffer's residence. (Doc. 16, ¶ 24.) They were not able to enter, because Bowie had lost his key to the residence. (*Id.* ¶ 25.) So they waited in Bowie's car for approximately 30 to 45 minutes. (*Id.* ¶ 26.) After waiting, they began traveling back to York Hospital to visit Mullinix. (*Id.* ¶ 27.) During this drive, Bowie video called Mullinix, who could see that Dante appeared in good health. (*Id.* ¶ 28.)

Allegedly while on the phone with Mullinix, Bowie gave Dante the bag of Teddy Grahams. (*Id.* ¶ 41.) Several minutes later, Bowie heard a thud and saw Dante's body slumped over. (*Id.* ¶ 31.) Bowie pulled the car over, brought Dante

---

[2] For ease of reference, the court uses the page numbers from the CM/ECF header.

into the front seat, and noticed that Dante was having difficulty breathing. (*Id.* ¶¶ 32, 34.) Presumably under a belief that this difficulty was caused by an obstruction, Bowie immediately stuck his fingers down Dante's throat in an attempt to dislodge the obstruction. (*Id.* ¶ 34.) In doing so, Bowie could feel that half-consumed Teddy Grahams were, in fact, causing an obstruction. (*Id.*) Bowie was unsuccessful in dislodging the Teddy Grahams. (*Id.* ¶ 35.) So, he then performed mouth-to-mouth breathing on Dante. (*Id.*) This was partially successful insomuch as Dante coughed up some Teddy Grahams onto Bowie's face, the residue of which Bowie wiped on his pants. (*Id.* ¶¶ 36–37.) Nevertheless, a blockage remained in Dante's airways. (*Id.* ¶ 39.) Realizing this, Bowie resumed driving to York Hospital. (*Id.*)

On his way, Dante again video called Mullinix to inform her of Dante's emergency. (*Id.* ¶ 42.) He then attempted to perform chest compressions on Dante while Dante laid between Bowie's torso and the steering wheel. (*Id.* ¶ 43.) This, too, was unsuccessful. (*See id.*) Bowie eventually delivered Dante to York Hospital around 10:45 p.m. (*Id.* ¶ 44.) Once Dante was in the care of hospital personnel, Bowie left for Peiffer's residence, knowing that Mullinix was at the hospital. (*Id.* ¶ 45.) There, Bowie allegedly threw away the bag of Teddy Grahams. (*Id.* ¶ 46.) At the hospital, Dante received treatment overnight and was

later flown to Hershey Medical Center for additional treatment.  (*Id.* ¶ 48.)

Tragically, Dante died several days later.  (*Id.* ¶ 49.)

### B. Investigation of Dante's Death

Defendant Kyler Hower ("Hower") was one of the York City Police

Department detectives who investigated Dante's death.  He first interviewed Bowie

the day after Dante allegedly choked on Teddy Grahams.  (*Id.* ¶ 70.)  This

interview was allegedly "extremely aggressive" and involved Hower repeatedly

accusing Bowie of killing Dante.  (*Id.* ¶ 71.)[3]  Bowie denied Hower's accusations

and explained that Dante had choked on Teddy Grahams.  (*Id.* ¶ 72.)  To

corroborate this story, Bowie pointed out the Teddy Grahams residue on his jeans

from the night before, which he was still wearing.  (*Id.* ¶ 73.)  A second, similar

interview between Hower and Bowie occurred on September 18, 2018.  (*Id.* ¶¶ 78–

81.)  Hower allegedly again accused Bowie of killing Dante, and Bowie again

denied this charge and insisted that Dante choked on Teddy Grahams.  (*Id.*)

On September 19, 2018, Hower filed a criminal complaint against Bowie

accompanied by an affidavit of probable cause ("Hower Affidavit"), charging

Bowie with criminal homicide and endangering the welfare of a child.  (Doc. 16-

1.)  The Hower Affidavit stated that an autopsy of Dante was conducted by the

---

[3] The amended complaint does not explain why Hower would accuse Bowie of killing Dante on
September 7 when Dante allegedly died "several days" after September 6.  (Doc. 16, ¶ 49.)
Nevertheless, this discrepancy is immaterial to resolving Defendants' motions to dismiss.

Dauphin County Coroner's Office. (*Id.* at 4.) The pathologist who conducted the autopsy was Defendant Dr. Wayne Ross ("Dr. Ross"). (Doc. 31-1, p. 16.) The Hower Affidavit indicated that the autopsy revealed Dante's death was a homicide caused by traumatic brain injury, strangulation, and suffocation. (Doc. 16-1, p. 4.) It also indicated two noteworthy statements that Bowie told Hower during their first interview. First, Bowie was the only individual with Dante when he stopped breathing. (*Id.*) Second, no other individual, beside Bowie, was present with Dante between when Bowie delivered Mullinix to the hospital and when Bowie delivered Dante there. (*Id.*)

Two days later, on September 21, Hower interviewed Peiffer at her residence. (Doc. 16, ¶ 82.) Hower allegedly told Peiffer during the interview that Bowie's "story is complete bullshit" and that the police "absolutely [had] hard evidence" linking Bowie to the charged crimes. (*Id.* ¶¶ 83, 84.) He then obtained Peiffer's consent to search her residence so that he could take pictures of Dante's diaper bag. (*Id.* ¶¶ 86, 87.) Hower subsequently inspected the diaper bag, which at this time did not contain the empty bag of Teddy Grahams. (*Id.* ¶ 88.) Peiffer offered to show the empty bag to Hower, but he refused, allegedly stating, "[w]e don't need them. [Bowie]'s guilty." (*Id.* ¶¶ 89–90.) Subsequently, Peiffer gave the bag to Bowie's criminal defense attorney. (*Id.* ¶ 92.) This allegedly enraged Hower and led him to threaten Peiffer with criminal tampering charges. (*Id.* ¶ 94.)

The investigation into Dante's death continued into 2019. By February of that year, investigators were still awaiting laboratory testing on evidence collected contemporaneously with the September 6 incident. (*See id.* ¶¶ 101–103.) Eventually, the results confirmed that "certain tan crusty material" recovered from Bowie's jeans and the interior of his car was "consistent with Teddy Grahams residue." (*Id.* ¶ 104.)

### C. Bowie's Preliminary Hearing

Bowie's preliminary hearing occurred on December 12, 2018. (*Id.* ¶ 96.) Two witnesses testified at this hearing, Hower and Dr. Ross. Hower testified, in relevant part, that Bowie "verified" several times "that he was the only one in care of [Dante] from the time he left the hospital to the time he returned and also verified that at the time Dante stopped breathing, he was in care of him." (Doc. 31-1, p. 9.)

Dr. Ross reaffirmed his conclusion that Dante's causes of death were traumatic brain injury, strangulation, and chest compression. (*Id.* at 17.) Dr. Ross detailed the injuries that led him to this conclusion. Dr. Ross observed "a series of bruises around the scalp" and inside of the skull, *id.*, which he described as "fresh bruising consistent with the time period in which [Dante] went in the hospital," *id.* at 21. Dr. Ross also observed "bleeding on the brain" and "trauma deep in the brain." (*Id.* at 17.)

7

Furthermore, Dr. Ross described "significant bruises over [Dante's] face as well as over his neck." (*Id.*)  The neck bruises, according to Dr. Ross, were "very severe," *id.* at 22, and consistent with "the hemorrhaging" he observed "deep in the neck." (*Id.* at 17.)  Dr. Ross also indicated that he observed backwards neck compression that was consistent with strangulation. (*See id.*)

Finally, Dr. Ross noticed bruises over the top of Dante's chest as well as inside it, which "indicated [Dante] also suffered chest compression." (*Id.*)  Dr. Ross was pressed on cross-examination whether these chest injuries could have been caused by CPR. (*Id.* at 19.)  He responded that the injuries were too great to be caused by CPR, whether done by a medical professional or a layperson. (*Id.* at 19–20.)

Dr. Ross also testified as to when he thought Dante sustained these injuries. He explained that he had viewed the Rutter's surveillance footage, which showed Dante walking. (*Id.* at 17.)  And, based on that video, Dr. Ross opined that Dante suffered his injuries after the period recorded on that video. (*Id.* at 18.)  Dr. Ross elucidated his rationale when asked a clarifying question by the presiding magisterial district judge:

> THE COURT: And you're saying that the injuries that [Dante] had when you examined him, you would have seen signs of that on [the Rutter's] video at that time?
>
> [DR. ROSS]: Well, I would say that when I looked at the [Rutter's] video and compared the injuries he had, injuries that he had were so

8

severe, so incapacitating, there's no way he's going to be walking around like he was in the video.

(*Id.* at 23.)

Based on the evidence at the hearing, the magisterial district judge held Bowie's case over for trial.

### D. Bowie's Trial

Bowie's trial began on December 5, 2022. (Doc. 16, ¶ 109.) The case was prosecuted primarily by Rachel Sherman ("Sherman") and Timothy Barker ("Barker"), both of whom at the time were assistant district attorneys with the York County District Attorney's Office. (*Id.* ¶ 117.) Bowie's amended complaint details only one aspect of trial in particular: the testimony of Dana Ward ("Ward")—a detective with the York County District Attorney's Office, *id.* ¶ 4— about the Rutter's surveillance footage.

Bowie highlights two specific aspects of Ward's testimony, both of which are about the accuracy of the Rutter's footage. The first came on direct examination by Sherman. Following presentation of the Rutter's footage to the jury, the following colloquy between Sherman and Ward ensued:

Q. The clips we just viewed, were those a fair and accurate representations [sic] of the points of video where you see the Defendant and [Dante] --

A. Yes.

Q. -- at the Rutter's?

A. Yes.

(Doc. 31-2, p. 5.)  The second came seemingly during cross-examination by

Bowie's criminal defense attorney.  That colloquy played out as follows:

> Q. Okay.  So let's move forward to the video that was taken at Rutter's, the edited video, Commonwealth's Exhibit 65.  Did you edit that video?
>
> A. I did not.
>
> Q. Okay.  Is it your understanding, based upon your view of that video today compared to when you saw the entire video, that basically it encompassed everything, from the time right before my client arrived to the point where he left?
>
> A. Correct.
>
> Q. Okay.  And to your knowledge, there were no glitches or missing parts of that video when my client would have been in the picture?
>
> A. No, sir.

(Doc. 31-2, p. 7.)

Bowie alleges that Ward's testimony above was false.  (Doc. 16, ¶ 118.)  He

claims the video shown at trial by prosecutors omitted the 15-second window

during which he observed Dante in the backseat of his car.  (*Id.*)  Bowie also

alleges that Sherman and Barker both knew that Ward's testimony was false, yet

failed to correct it in court.  (*Id.* ¶¶ 119, 121, 122.)  According to Bowie, omission

of this 15-second period was "materially misleading" at trial, because it suggested

that Bowie was not concerned about Dante's health.  (*Id.* ¶ 120.)

Ultimately, the jury returned a verdict of not guilty on all charges, and Bowie was released from custody.  (*Id.* ¶ 143.)  The present suit followed.

### E. Procedural Posture of Present Lawsuit

Bowie filed his complaint in this matter on December 6, 2024.  (Doc. 1.)  He then amended his complaint on March 20, 2025.  (Doc. 16.)  The amended complaint lists five counts.  Counts one and two assert malicious prosecution claims against Hower pursuant to 42 U.S.C. § 1983 and Pennsylvania common law, respectively.  (*Id.* ¶¶ 150–59.)  Counts three and four assert the same two claims against Dr. Ross.  (*Id.* ¶¶ 160–70.)  Count five brings what is labelled as a § 1983 "Malicious Prosecution/Denial of Procedural Due Process" claim against Hower, Ward, Sherman, and Barker.  (*Id.* ¶¶ 171–78.)

On April 2, 2025, two motions to dismiss were filed.  The first was filed solely by Hower.  (Doc. 18.)  The second was filed collectively by Dr. Ross, Ward, Sherman, and Barker.  (Doc. 20.)  The parties filed a panoply of briefs, all of which the court has reviewed.  (Docs. 19, 21, 24, 25, 27, 28, 31, 32, 36, 37.)  The motions to dismiss are now ripe for adjudication.

JURISDICTION

The court has subject matter jurisdiction over Bowie's § 1983 claims pursuant to 28 U.S.C. §§ 1331, 1343.  Additionally, the court has supplemental

jurisdiction over his state law claims pursuant to 28 U.S.C. § 1367. Venue is

proper in this court pursuant to 28 U.S.C. § 1391(b).

### STANDARD OF REVIEW

In order "[t]o survive a motion to dismiss, a complaint must contain

sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible

on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.*

*v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible on its face "when the

plaintiff pleads factual content that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged." *Id.* (quoting

*Twombly*, 550 U.S. at 556). "Conclusory allegations of liability are insufficient" to

survive a motion to dismiss. *Garrett v. Wexford Health*, 938 F.3d 69, 92 (3d Cir.

2019) (quoting *Iqbal*, 556 U.S. at 678–79). To determine whether a complaint

survives a motion to dismiss, a court identifies "the elements a plaintiff must plead

to state a claim for relief," disregards the allegations "that are no more than

conclusions and thus not entitled to the assumption of truth," and determines

whether the remaining factual allegations "plausibly give rise to an entitlement to

relief." *Bistrian v. Levi*, 696 F.3d 352, 365 (3d Cir. 2012) *abrogated on other*

*grounds as recognized in Mack v. Yost*, 968 F.3d 311, 319 n. 7 (3rd Cir. 2020).

**DISCUSSION**

The parties' briefing poses many questions of law.  These include whether Dr. Ross acted under the color of state law for § 1983 purposes, whether Defendants are entitled to qualified immunity, and whether Sherman and Barker are entitled to absolute prosecutorial immunity.  Many of Bowie's arguments on these questions, however, presuppose facts beyond what is alleged in or can reasonably be inferred from the amended complaint.  This discrepancy makes it imprudent to consider all of these legal issues at this stage.  Therefore, the court only reaches the threshold question presented—whether Bowie has adequately alleged his claims.  The answer is no.

### A. Malicious Prosecution Claims

The court begins with Bowie's malicious prosecution claims.  Both his federal and state-law claims are only viable if probable cause did not exist to initiate the prosecution against him.  *Brown v. Mercadante*, 687 F. App'x 220, 223 (3d Cir. 2017) (applying Pennsylvania law); *Curry v. Yachera*, 835 F.3d 373, 379 (3d Cir. 2016) (applying § 1983).  The court's analysis of Defendant's malicious prosecution claims begins and ends with this element.

### 1.  Legal Standard

A precise definition of probable cause is notoriously elusive.[4]  *See District of Columbia v. Wesby*, 583 U.S. 48, 64 (2018) (quoting *Illinois v. Gates*, 462 U.S. 213, 232 (1983)) ("Probable cause . . . cannot be 'reduced to a neat set of legal rules.'"); *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) ("The probable-cause standard is incapable of precise definition or quantification into percentages . . . ."); *Ornelas v. United States*, 517 U.S. 690, 695 (1996) ("Articulating precisely what . . . 'probable cause' mean[s] is not possible.").  This is because probable cause "is a 'practical, nontechnical conception' that deals with 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'"  *Pringle*, 540 U.S. at 370 (quoting *Gates*, 462 U.S. at 231).

Nevertheless, the core "substance of all the definitions of probable cause is a reasonable ground for belief of guilt."  *Id.* at 371 (quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949)).  In the specific context of malicious prosecution actions, probable cause has been articulated as: "reasonable ground of suspicion supported by circumstances sufficient to warrant an ordinary prudent man in the same situation in believing that the party is guilty of the offense."  *Napier v. City of*

---

[4] The standard for determining the existence of probable cause is the same under federal and Pennsylvania law.  *Bracken v. Manor Twp.*, 665 F. Supp. 3d 675, 707 (W.D. Pa. 2023), *aff'd sub nom. Bracken v. Twp. of Manor*, No. 23-1763, 2024 WL 4210535 (3d Cir. Sept. 17, 2024); *Watson v. Witmer*, 183 F. Supp. 3d 607, 617 (M.D. Pa. 2016); *Commonwealth v. Evans*, 685 A.2d 535, 537 n.2 (Pa. 1996).

*New Castle*, 407 F. App'x 578, 583 (3d Cir. 2010) (quoting *Thomas v. E.J. Korvette, Inc.*, 476 F.2d 471, 474 (3d Cir. 1973)).  Meeting this standard is "not a high bar."  *Kaley v. United States*, 571 U.S. 320, 338 (2014).

When, like here, a neutral magistrate already determined that probable cause existed by issuing an arrest warrant, the court "defers to [the warrant] unless the officer misrepresented material information to get the warrant."  *Pinkney v. Meadville*, 95 F.4th 743, 748 (3d Cir. 2024).  This means that Bowie's malicious prosecution claims can succeed only if the Hower Affidavit included deliberately or recklessly made material falsehoods or omissions such that probable cause would not have existed without them.  *Id.*; *Wilson v. Russo*, 212 F.3d 781, 786 (3d Cir. 2000).

Therefore, the court must "conduct a two-pronged analysis to determine whether probable cause existed" to charge Bowie.  *Stafford v. Morris*, 816 F. App'x 712, 715 (3d Cir. 2020).  First, the court must consider whether Hower "made false statements or omissions" with "at least a reckless disregard for truth" that "created a falsehood in applying for the warrant."  *Id.* (quoting *Andrews v. Scuilli*, 853 F.3d 690, 697 (3d Cir. 2017)).  Second, the court must consider

whether such falsehoods or omissions were material to the finding of probable cause.[5]  *Id.*

While the analysis is "necessarily fact-intensive," *Dempsey v. Bucknell Univ.*, 834 F.3d 457, 468 (3d Cir. 2016), "it is well settled that district courts may decide the existence of probable cause as a matter of law."  *Givens v. Wal-Mart Stores, Inc.*, No. 22-2989, 2023 WL 7144628, at *3 (3d Cir. Oct. 31, 2023).  And, indeed, courts "consistently reconstruct probable cause affidavits at the motion to dismiss stage," *Jackson v. Sullivan*, No. 24-cv-4235, 2025 WL 2731428, at *11 (D.N.J. Sept. 25, 2025), to determine whether "the facts alleged, viewed in the light most favorable to the plaintiff, demonstrate the existence of probable cause." *Nixon v. Rutter*, No. 23-cv-627, 2024 WL 4651034, at *3 (D. Del. Nov. 1, 2024).

### 2.  Reconstructing the Hower Affidavit

Bowie's amended complaint does not explicitly identify any falsehoods or omissions in the Hower Affidavit.  Instead, it identifies two investigatory failures that Bowie considers important generally to a probable-cause determination.  (Doc. 16, ¶ 132.)  First, he faults Hower and other trial witnesses for not offering a motive as to why Bowie would harm Dante.  (*Id.*)  Second, he faults Dr. Ross for

---

[5] Bowie argues that Hower did not make any arguments regarding this reconstruction analysis and, thus, has waived such arguments.  Regardless of specific sub-arguments, Hower clearly argues that probable cause existed to charge Bowie.  (*E.g.*, Doc. 19, p. 18–19.)  Thus, the court does not consider this issue waived.

not explaining the significance of the Teddy Graham residue to his cause-of-death determination, *id.*, even though the residue test results did not come back until after Dr. Ross made this determination. (*See id.* ¶¶ 101–04.) These purported investigatory failures do not go to the Hower Affidavit's truthfulness.

The only mention of alleged falsehoods or omissions in the Hower Affidavit come in Bowie's briefing. (Doc. 25, pp. 14–15.) He identifies two. The first is that Hower omitted from his description of the Rutter's surveillance footage any mention of the 15 seconds Bowie spent observing Dante through the car window. (*Id.* at 14.) The second is that Hower omitted the existence of the empty Teddy Grahams bag.[6] (*Id.* at 14–15.)

A generous reading of the amended complaint might support Bowie's assertion that Hower made these omissions with reckless disregard for truth.[7] Although, there is no allegation that Hower knew about the empty bag's existence before his interview with Peiffer on September 21, two days after he submitted the Hower Affidavit. (*See* Doc. 16, ¶ 82–89.) Nevertheless, even assuming these

---

[6] Despite not being pleaded, these omissions are reasonable inferred from the facts alleged in the amended complaint.

[7] "[O]missions are made with reckless disregard if an officer withholds a fact in his ken that '[a]ny reasonable person would have known that this was the kind of thing the judge would wish to know.'" *Wilson*, 212 F.3d at 788 (quoting *United States v. Jacobs*, 986 F.2d 1231, 1235 (8th Cir. 1993)).

omissions were made with reckless disregard, *arguendo*, Bowie has not adequately alleged that the omissions were material to the probable-cause determination.

The Hower Affidavit details significant inculpatory evidence, none of which Bowie alleges was included with reckless disregard for truth. It reports that the Dauphin County Coroner's Officer ruled Dante's death a homicide caused by traumatic brain injury, strangulation, and suffocation. (Doc. 16-1, p. 4.) It details the observation of detectives that Dante "appear[ed] to be healthy and able to walk on his own" at the Rutter's shortly before he was brought to the hospital. (*Id.*) It reports that Bowie told Hower that "no other adults," other than himself, "were present that could have caused these injuries" between the time Bowie and Dante left the hospital to the time they returned. (*Id.*) It notes that Bowie also told Hower that Dante was in Bowie's care when Dante stopped breathing. (*Id.*)

The fact that an empty Teddy Grahams bag was at Peiffer's residence or that Bowie spent 15 seconds staring at Dante through a car window at the Rutter's, without more, does not undermine the inculpatory evidence in the Hower Affidavit. On balance, a reasonable person would believe Bowie committed an offense considering both the exculpatory alleged omissions and the inculpatory evidence. *See generally Cummings v. City of Philadelphia*, 137 F. App'x 504, 506 (3d Cir. 2005) ("In assessing whether probable cause exists, the inculpatory evidence should be weighed against the exculpatory evidence to determine whether

a reasonable person would believe an offense has been committed by the

suspect.").

### 3. Dissipation of Probable Cause

Bowie alternatively alleges that even if probable cause existed at the time he

was charged, probable cause "dissipated" when lab results showed that the tan

crusty material found in his car was consistent with moist Teddy Grahams residue.

(Doc. 16, ¶ 152.)  Bowie is correct to suggest that probable cause must exist

throughout a criminal prosecution.  *See Thompson v. City of Williamsport*, No.

4:22-.CV-01159, 2023 WL 8005306, at *13 n.175 (M.D. Pa. Nov. 17, 2023)

("[T]hat the prosecution was initiated with probable cause does not necessarily

defeat a malicious prosecution action if the prosecution continued after probable

cause dissipated."); *Naslanic v. Gula*, No. 3:15-CV-2208, 2018 WL 1886526, at *6

(M.D. Pa. Mar. 29, 2018), *R. & R. adopted sub nom.*, *Naslanic v. Musto*, 2018 WL

1886493 (M.D. Pa. Apr. 19, 2018) ("Where intervening events negate probable

cause, and the authorities know of those intervening events but fail to act,

government actors may still be sued for malicious prosecution if they persist in

pursuing a case long after probable cause has collapsed.").

But, Bowie places too much stock in this evidence.  Consider Dr. Ross's

testimony at Bowie's preliminary hearing, which occurred before the Teddy

Grahams testing returned.  At the hearing, Dr. Ross opined that Dante suffered

significant injuries to his head, throat, and chest.  (Doc. 31-1, p. 17.)  He opined

that Dante had to have suffered these injuries after he was seen walking at Rutter's,

because his injuries would have been "so incapacitating" that he would not have

been able to walk like he did at Rutter's.  (*Id.* at 23.)  And, consider that Bowie

admitted to Hower that no other adult was with Dante between their time leaving

the hospital and returning.  (Doc. 16-1, p. 4.)  These facts establish probable cause.

Now ask whether these facts are undermined by the detection of Teddy Grahams

residue in Bowie's car.  The answer plainly is no.  The residue has nothing to do

with the severe injuries Dr. Ross observed during Dante's autopsy.  It has nothing

to do with Dr. Ross's medical opinion that Dante suffered these injuries after being

at the Rutter's.  It has nothing to do with the fact that Bowie was the only

individual with Dante after they left the Rutter's.  At most, this evidence

corroborates Bowie's description of what happened to Dante while he was caring

for him.  But Bowie's description does not clearly explain Dante's cause of death,

and the evidence regarding cause of death contradicts Bowie's description in any

event.  Therefore, on the facts alleged here, the court cannot say that the existence

of Teddy Grahams residue in Bowie's car negated probable cause given the

substantial evidence establishing probable cause.

     Ultimately, Bowie has failed to allege that Hower lacked probable cause to

file and maintain the charges.  This dooms all of Bowie's malicious prosecution

claims.  Accordingly, the court will dismiss counts one through four of the amended complaint.

### B. Procedural Due Process Claim

As recognized by the Third Circuit, the government's use of "fabricat[ed] evidence to charge or convict [a] defendant" is an affront to "the defendant's right to due process of law."  *Halsey v. Pfeiffer*, 750 F.3d 273, 292 (3d Cir. 2014). Indeed, "no sensible concept of ordered liberty is consistent with law enforcement cooking up its own evidence."  *Id.* at 292–93.  Bowie claims that Defendants Ward, Bower, Sherman, and Barker violated his right to due process through the introduction of fabricated evidence.  (Doc. 16, ¶¶ 171–78.)  Specifically, the "fabricated evidence" upon which Defendants relied, according to Bowie, is an excerpt of the Rutter's surveillance footage shown at trial that omitted the 15 seconds when Bowie was watching Dante through the car window.  (*See id.*)

For his claim to proceed, Bowie must adequately plead that "there is a reasonable likelihood that, absent th[e] fabricated evidence, [he] would not have been criminally charged."  *Black v. Montgomery Cty.*, 835 F.3d 358, 371 (3d Cir. 2016).  A "notable bar" must be cleared for "evidence to be considered 'fabricated.'"  *Id.* at 372.  Only in the unusual case will a plaintiff prevail on a § 1983 fabricated-evidence claim.  *Boseman v. Upper Providence Twp.*, 680 F. App'x 65, 70 (3d Cir. 2017); *Black*, 835 F.3d at 372; *Halsey*, 750 F.3d at 295.

Fabricated evidence is not "testimony that is incorrect or simply disputed." *Black*, 835 F.3d at 372; *see Golden v. Tully*, No. 14-cv-3858, 2018 WL 5296374, at *8 (E.D. Pa. Oct. 25, 2018) ("A fabrication of evidence claim will not survive where the 'fabricated' evidence consists of disputed statements in a police report, or 'he-said, she-said' testimony."); Evidence, *Black's Law Dictionary* (12th ed. 2024) (defining "fabricated evidence" as "[f]alse or deceitful evidence that is unlawfully created, usu[ally] after the relevant event, in an attempt to achieve or avoid liability or conviction"). Bowie has failed to satisfy this standard for two reasons.

First, Bowie has not adequately alleged that the excerpted Rutter's video was "fabricated." Bowie does not allege that law enforcement or the prosecutors altered the timeline of the footage shown at trial or surreptitiously deleted footage from the video. Instead, his position rests on the logic that presenting an excerpt of a longer video means it is fabricated. That is not correct. This is not to say that an excerpted video can never be considered fabricated. One can imagine a case in which an excerpted video might rise to the level of fabricated if, for example, the original full video was not provided in discovery and the defendant was not aware of the un-excerpted video. But, this is not that case here. Bowie has not alleged that he did not have access to the full video. In fact, at trial, his counsel referred to the video as the "edited video" when cross-examining Ward. (Doc. 31-2, p. 7.) Here, it simply appears that prosecutors chose to play an excerpt of a longer video

during Ward's testimony and that Ward testified the video was a fair and accurate representation of what happened.  Bowie could have disputed this testimony by showing another excerpt of the video to display the omitted portion.  At most, this is the type of disputed evidence that is insufficient to support a fabricated-evidence claim.

Second, there is no allegation that Bowie likely would not have been charged had it not been for the presentation of the excerpted Rutter's video.  The video was presented at trial, long after probable cause had been established through the Hower Affidavit and the testimony at the preliminary hearing.  It could not have played a role in the decision to bring charges.  *See Kramer v. City of Pittsburgh*, No. 19-cv-539, 2020 WL 5797940, at *2 (W.D. Pa. Sept. 29, 2020) (dismissing § 1983 fabricated-evidence claim when the alleged fabricated evidence only involved trial testimony, because such evidence "could not have affected whether [p]laintiff had been criminally charged in the first place").

Perhaps recognizing this failing, Bowie's briefing attempts to recast his claim.  In his briefing, Bowie states that prosecutors and law enforcement altered the Rutter's surveillance footage throughout the investigation of Dante's death in order to pursue Bowie.  (*E.g.*, Doc. 24, p. 15.)  Such conduct is neither alleged in Bowie's amended complaint nor reasonably inferred from the allegations he does

make.  The court, therefore, will not consider such claims in ruling on Defendants'

motion to dismiss.  *Katchur*, 354 F. Supp. 3d at 662 n.3.

The court determines that Bowie has failed to plead a § 1983 claim against

Defendants for using fabricated evidence.  Thus, count five of Bowie's amended

complaint will be dismissed.

### CONCLUSION

For the reasons set forth herein, Bowie's amended complaint will be

dismissed.  However, the court cannot conclude that amendment would be futile,

especially given the discrepancies between the allegations in the amended

complaint and the factual assertions made in Bowie's briefing.  Therefore, the

dismissal of all counts will be without prejudice.  An appropriate order will issue.

> s/Jennifer P. Wilson
> JENNIFER P. WILSON
> United States District Judge
> Middle District of Pennsylvania

Dated: January 28, 2026