# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

---

TYREE BOWIE,                       :
                                   :
                    Plaintiff,     :     No. 1:24-CV-02105-JPW
        vs.                        :
                                   :     Judge Jennifer P. Wilson
KYLE HOWER,                        :
in his personal capacity only,     :     **JURY TRIAL DEMANDED**
                                   :
                    Defendant.     :

---

## Second Amended Complaint

Tyree Bowie by undersigned counsel, Mette, Evans & Woodside, files this second amended complaint against Defendant Kyle Hower in his personal capacity only.

### I. Parties

1.      Plaintiff Tyree Bowie ("Bowie") is an adult individual who was at all relevant times a resident of York County, Pennsylvania.

2.      Defendant Kyle Hower ("Hower") is an adult individual who was at all relevant times an employee of the City of York, serving as a detective with the York City Police Department.  Hower is sued in his personal capacity only.

## II.  Jurisdiction and Venue

3.      This Court has jurisdiction under 28 U.S.C. § 1343.  This case is brought under 42 U.S.C. § 1983.  Attorney's fees are authorized under 42 U.S.C. § 1988.

4.      Venue is proper pursuant to 28 U.S.C. § 1391(b)(2), because York County, located in the Middle District of Pennsylvania, is the location where a substantial part of the events or omissions giving rise to the claim occurred.

## III.  Facts

**A.      PRE-AFFIDAVIT INVESTIGATION: DANTE'S PRE-EXISTING INJURIES, CYF INVOLVEMENT, AND DOCUMENTED NEGLECT BY DANTE'S MOTHER, LEAH MULLINIX.**

5.      On September 6, 2018, at approximately 10:30 p.m., York City Police Department ("YCPD") dispatched to York Hospital (the "Hospital") for reports of an unresponsive child after Bowie had rushed two-year-old Dante Mullinix ("Dante") to the emergency room.

6.      Upon arrival, officers were immediately informed by Dante's mother, Leah Mullinix ("Mullinix"), that Dante had choked on animal crackers and that Bowie had attempted to give him mouth-to-mouth resuscitation and CPR.

7.      Mullinix had been in real-time audiovisual communication via FaceTime with Bowie as Bowie had been driving Dante to the hospital while simultaneously trying to address the medical emergency Dante was undergoing.

2

8.    Mullinix told officers that she was at the emergency room that night waiting to be treated for a migraine, while Bowie had been driving around to various places with Dante and had taken him to a Rutter's convenience store.

9.    When YCPD asked Mullinix if Dante had any prior medical conditions, she stated that he had a cough and an infection, had not been eating properly, and had routinely banged his head into walls and solid objects.

10.    Mullinix also told officers that she and Dante were staying at the York Access Shelter (the "Shelter") because she had just gotten out of an abusive relationship.

11.    Officers already knew of Mullinix and Dante, because YCPD had received two ChildLine reports the day before, on September 5, from WellSpan and the Shelter documenting bruises on Dante and reporting Mullinix's refusal to treat a severe infection on his penis despite York County Children, Youth & Families ("CYF") offering transportation and funding.

12.    Moments after YCPD arrived at the hospital, doctors approached Mullinix and informed her that Dante was suffering from a brain bleed and had to be airlifted to Hershey Medical Center for more advanced treatment.

13.    Doctors in the emergency department confronted Mullinix at that time about several bruises appearing on Dante's body.

14.    Mullinix claimed that Dante had fallen on asphalt.

3

15. Hospital security then informed YCPD officers that there were "signs of abuse to the child," and officers immediately transported Mullinix to the police station to be interviewed.

16. One responding officer explicitly noted that Mullinix, despite her two-year-old child having been "sprinted" into the emergency department with no pulse, had "displayed little emotion" during their interaction while at the hospital.

17. At approximately 11:30 p.m., Hower, who at all relevant times was the detective in charge of the investigation into Dante's incident, was notified and coordinated with officers already on the scene, as well as with an assistant district attorney and a supervisor from York County CYF.

18. At approximately 12:30 a.m. on September 7, 2018, Hower administered *Miranda* warnings to Mullinix and began to interview her.

19. Hower began the interview by asking Mullinix to affirm that he and Mullinix had never met before.

20. Later in the interview, Hower stated to Mullinix, "You understand that I am going to try to help you out as much as I can."

21. Mullinix repeated what she had told officers at the hospital: Dante had choked on animal crackers, and Bowie, while in real-time audiovisual communication with her, had performed mouth-to-mouth resuscitation and CPR before rushing Dante to the hospital.

22.    Mullinix told Hower she had "seen him choke before." When Hower questioned whether Mullinix has seen Dante choke on animal crackers specifically, Mullinix replied, "sometimes…"

23.    Just as she had told officers at the hospital, Mullinix again stated that Dante had been having difficulty eating, adding that she was especially worried about Dante the morning of September 6 because he would not eat lunch when they returned to the Shelter.

24.    Mullinix told Hower that Dante had been in the hospital twice in the last week, but also stated that she did not want Dante to be in the E.R. with her that night because "he bangs his head and flips out."

25.    Mullinix also claimed that Dante would sometimes bang his head on the wall when she scolded him, and stated that Dante had banged his head against the wall "a couple times" that day, but only when he was alone with Mullinix.

26.    Additionally, Mullinix claimed that in the week leading up to Dante's medical emergency and since they had moved into the Shelter, "[h]e has been banging his head a lot."

27.    Mullinix informed Hower that on the morning of September 6, 2018, CYS had transported both Dante and her from the Shelter to Express Care, where doctors re-evaluated the severe penile infection Dante was suffering from.

28. Mullinix claimed the infection had been caused by almost-three-year-old Dante sitting in his own urine, adding "I was trying to potty train him at one point too."

29. Also with regard to Dante's health, Mullinix told Hower that Dante had been coughing mainly at night.

30. Mullinix also claimed that Dante was clumsy and would fall more than usual when tired, adding that Dante had been throwing himself onto the floor, which she believed caused the bruises on his forehead and back.

31. When Hower asked about Mullinix's relationship with Bowie, Mullinix stated that they had been dating for a "couple weeks" and that this had been Dante's first time alone with Bowie.

32. When Hower asked whether Bowie had been physically abusive, Mullinix replied that he had never physically abused her or Dante, nor had he ever disciplined Dante.

33. Mullinix further explained to Hower that Bowie had helped her and Dante gain admission to the Shelter to escape Mullinix's abusive ex-boyfriend.

34. Mullinix clarified to Hower that Bowie did not reside at the Shelter with Dante and her, and that Bowie was not with them at the Shelter the night before Dante's incident.

35.    During the interview, Hower searched one of Mullinix's cell phones and reviewed text messages she had exchanged with Bowie.

36.    As part of this, Hower read aloud messages Mullinix had sent instructing Bowie to give Dante a bath, as well as a message in which Bowie stated, "[E]very time I see him, he has a new bruise," urging Mullinix to report Dante's abuser to the authorities.

37.    Mullinix stated to Hower that a prior paramour had smacked Dante on more than one occasion and might have caused him to suffer a bloody nose.

38.    Mullinix also admitted to having been with the paramour who had allegedly abused Dante a "few weeks" earlier.

39.    Hower further read aloud messages of Bowie informing Mullinix that Dante had fallen while attempting to get out of the car that night, to which Mullinix had responded to Bowie, "I have CYS up my ass. Lil shit needs to learn how to listen."

40.    Hower also read messages Bowie had sent to Mullinix after he left the hospital describing his efforts to revive Dante, stating "I was beating on his chest and the cookies was coming out his nose."

41.    Acknowledging that Mullinix had been in real-time audiovisual communication with Bowie while he was performing CPR on Dante, Hower asked

whether Mullinix could see Dante, and Mullinix replied "It was dark, but I could see a little."

42. While Hower interviewed Mullinix, another YCPD officer, Tiffany Pitts ("Pitts"), visited Dante at Hershey Medical Pediatric Intensive Care Unit and noted that Dante was missing sections of hair, had a bite mark on his arm, and was covered in bruises, opining that some bruises looked older than a day.

43. The attending physician advised Pitts that Dante was suffering from subdural bleeding, both acute and with the onset of subacute, inside his brain.

44. At approximately 9:20 a.m., also on the morning of September 7, less than 12 hours after Dante had been hospitalized, Bowie voluntarily called YCPD at approximately 9:20 a.m. and stated that he wanted to come in "immediately" to speak with detectives about Dante's incident.

45. Bowie promptly arrived at YCPD headquarters at 9:50 a.m. and Hower administered *Miranda* warnings to him before starting the interview.

46. During his interview, Bowie recounted the timeline of events, stating that he had picked up Dante and Mullinix from the Shelter at 11:00 a.m., had gone to Master Staffing to pick up his paycheck, then to Walmart, then to a Denny's restaurant around 2:30 p.m., then to a Burger King, and then Laci Peiffer's house around 3:30 p.m. where they watched Trolls until Mullinix was taken to the hospital for treatment for a migraine.

8

47.     When Hower asked Bowie where Dante's car seat was, Bowie stated that it had been left in Mullinix's car so he had to use a booster seat, but stated that he had returned the booster seat to his mother's porch before 1:00 a.m. after dropping off Dante at the hospital.

48.     Consistent with Mullinix's statement to Hower and responding officers, Bowie also relayed that Dante had stopped breathing while eating animal crackers and that Bowie had attempted mouth-to-mouth resuscitation, CPR, and Heimlich, before rushing Dante to the hospital.

49.     Bowie stated that while performing mouth-to-mouth, animal cracker residue had sprayed all over him, showing Hower the residue stain on his pants.

50.     Panicked that Dante still could not breathe, Bowie had shoved his fingers down Dante's throat in an attempt to dislodge the food and had performed chest compressions.

51.     When Hower asked a leading question to Bowie in attempt to get Bowie to concede Dante had been in good health prior to his medical emergency, Bowie directly told Hower that he would not characterize Dante as "healthy," before Hower cut off his response.

52.     As stated in the interview transcript,

> **Q:     You had him. He was all right. He was healthy.**
> **A:     Not entirely –**
> **Q:     -- not in dire need of care.**
> **       (Cell phone ringing.)**

9

> **TYREE:**    I don't want to say he was healthy. You know, like I said, when he was eating that hamburger, he –
>
> **BY DETECTRIVE HOWER:**
> **Q:**    How do you turn this sound off?

53.    Bowie explained that Dante had been experiencing trouble eating and had thrown up red vomit earlier that day after eating Burger King.

54.    Bowie related to Hower that, after vomiting, Dante had even attempted to eat his own vomit.

55.    Bowie also stated that he had received text messages from Mullinix complaining that Dante would not eat; Bowie further told Hower that Dante had been gagging while eating.

56.    Multiple times during his interview, Bowie informed Hower that Dante had been in and out of the hospital all week, yet Hower again did not ask any follow-up questions about Dante's significant health problems that had taken him to the hospital prior to the night of Dante's medical emergency.

57.    Bowie also informed Hower that Dante had been suffering from fevers, and had fallen earlier while in the car at Rutter's, hitting his face on the seat.

58.    Bowie additionally told Hower that Dante had a black eye when they had met, and that Mullinix had sent videos to him of Dante banging his head, photos showing marks on Dante's body, and messages about Dante losing hair.

10

59.    Mullinix had told Bowie that Dante would only bang his head around her, and nobody else.

60.    Bowie also informed Hower that he had received texts accusing Mullinix of being an unfit mother, explaining that Mullinix was being investigated by Child Services.

61.    When Bowie said that Mullinix's sister, Sarah Mullinix ("Sarah"), had been trying to get custody of Dante, Hower replied, "Why is it any of her business?"

62.    During the interview, Bowie repeatedly requested that Hower corroborate his account of events by looking at the digitally-preserved communications between him and Mullinix, interviewing Sarah and Shelter staff, and testing the residue stain on his pants.

63.    Hower told Bowie, "I am not talking to any shelter," changed the subject and dismissed Bowie when he mentioned digital evidence demonstrating Dante's pre-existing injuries, stating at one point, "I'm not going to sit here and listen to your excuses."

64.    Additionally, Hower told Bowie, "I explained to you before this ain't on her," referencing Mullinix, to which Bowie responded, "But if there's bruises, like I said, there's texts in my phone stating that – I am questioning her about

11

bruises. And she's telling me it happened here, it happened there. Like –." Hower interrupted Bowie at that point to tell him that Dante was brain dead.

65. Appearing to rule out Mullinix as a suspect less than twelve hours since Dante had been hospitalized, Hower stated to Bowie, "I am not worried about your phone," and "I am not worried about her."

66. Before Bowie's interview concluded, Pitts arrived and stated to Hower and Bowie, "As you know, I have been talking to the doctor. I think this is an ongoing thing with this kid. There's a bruise and then there's other bruises," adding, "I can see the original bruise that was there had been there for maybe a week. We will say a week." Bowie replied, "It's in my phone. It's in my phone. I asked her about that."

67. At around the same time that Bowie's interview ended, Officer Crumpton ("Crumpton") of YCPD called Bowie's mother, Cheryl Preston, who told him that she had found the booster seat on her porch and had taken it to the back of her house, corroborating Bowie's timeline of events.

68. Later on September 7, Pitts spoke with Marsha Forbes from York County CYF, who stated that she had observed scabs on Dante's face and areas of missing hair on the morning of September 6, hours before Bowie picked up Mullinix and Dante from the Shelter.

69.     On September 9, Pitts received a call from Megan Moore of CYS, who stated that she had observed a bruise on Dante's head on September 2.

70.     This same day, Hower interviewed Sarah Mullinix, Leah Mullinix's sister and Dante's aunt, who corroborated Bowie's claims that she was attempting to get custody of Dante and similarly informed Hower that there was CYF report on Mullinix.

71.     Sarah Mullinix told Hower that she thought Dante was in danger in Mullinix's care and stated that her children had observed Mullinix hit Dante, pull his arms, and cause him to hit his head.

72.     Also on September 10, Bowie's friend, Laci Peiffer ("Peiffer"), voluntarily contacted YCPD and came into the station to be interviewed by Crumpton at approximately 2:11 p.m.

73.     Peiffer informed Crumpton that she had known Bowie for approximately seven years and he had been staying with her at her house on Lexton Drive for about two weeks.

74.     Peiffer also told officers that Bowie had been with Mullinix for the same period of time, although Peiffer had never met her.

75.     Peiffer also said that Bowie had told her he wanted to call Child Services on Mullinix because he was worried about her being homeless with Dante, emphasizing to Peiffer that he "loved the little boy."

76. At approximately 2:31 p.m. on September 10, Hower searched Bowie's vehicle and logged evidence that further corroborated Bowie's statements in his September 7 interview.

77. From Bowie's vehicle, Hower personally retrieved several receipts dated September 6, including a Walmart Receipt timestamped at 1236 hours, Citizen Bank receipts timestamped at 1303-1305 hours, and a Burger King receipt timestamped at 1501 hours. Each receipt corroborated Bowies order of events.

78. Also found in Bowie's vehicle was a WellSpan Health Summary from 0951 hours on September 6, two unfilled prescriptions, and a bottle of Cephalexin, demonstrating Dante's medical concerns and Mullinix's failure to fill his prescriptions.

79. On September 11, Hower interviewed Preston, Bowie's mother, who informed Hower that Bowie and Mullinix had not been dating for very long and confirmed to Hower that, to her knowledge, Bowie had never been alone with Dante.

80. Preston again acknowledged that she had seen a booster seat on her front porch the morning of September 7, and stated that the last time she had spoken to Bowie had been the evening September 5, when Bowie came to Preston's house alone to tell her about a new job.

14

81.   Preston informed Hower that the first time she had met Dante and Mullinix, she had had concerns that Dante's behavior demonstrated a possible history of abuse rather than autism, as Mullinix had expressed to her.  Preston, who had been taking Social Service classes at HACC, advised Hower that she had told Mullinix, "If your little boy is being abused, I am pretty sure that's a reason why he is not talking."

82.   Preston informed Hower that the next time she had seen Dante, Bowie had called the Access Shelter due to fears that Dante had been being abused by a "Spanish" guy who would hit Dante and throw him on the toilet for hours at a time if he wet himself, and that the man's mother would slap Dante in the head.

83.   Preston told Bowie, "…if you know something, you need to call Children Services[,]" and Bowie then hugged Dante, and replied "I know, but maybe if I can just be around, I can protect him."

84.   Preston stated that the third and final time she saw Dante, which was approximately one week ago, Bowie had asked Preston for ointment for Dante's infection because Mullinix had not gotten his prescription.

85.   When Hower asked Preston what she thought had happened to Dante, Preston referenced Mullinix and replied "I think she did something to that little boy. It's just really odd that at 8:30 at night she has a migraine. She wants to go to the hospital."

86.     Preston, knowing that Hower had pressured Bowie to take a stress test during his interview, inquired whether Hower asked Mullinix to take a stress test as well. Hower replied, "She doesn't need one."

87.     The interview concluded with Preston opining that she did not believe Bowie harmed Dante.

88.     On September 18, an autopsy was performed on Dante and a Postmortem Report and Coroner's Comprehensive Report of Death Investigation ("Coroner's Report") was produced.

89.     On its face, the first two pages of the Postmortem report contained numerous errors.

90.     For example, the report states that Dante's penis infection had been caused by a recent circumcision, although a HSV 2 test was performed while Dante was on life support and revealed that he was suffering from herpes, and Mullinix clarified to Hower that Dante had not been circumcised as a two-year-old.

91.     Additionally, it stated that Bowie claimed that Dante "fell out of the car," adding, "This story conflicted with a later story that the decedent was eating an animal cracker and choked prior to arrival at the ED."

92.     This statement is materially erroneous as Bowie told Hower in his *first* interview that Dante had fallen *inside* the car and that he had been eating

animal crackers when he stopped breathing, which officers had immediately become aware of upon arrival at the hospital.

93.    Notably, the Report also states that a friend of Mullinix had been "taking her in as a guest in his house," implicitly introducing another potential suspect of Dante's "multiple bruises in various stages of healing" documented in this report.

94.    Stated again in the Report is the fact that Dante had "multiple injuries that appear to be in different stages of healing" and "traumatic alopecia," and it confirms "acute aon sub-acute bilateral subdural hematomas."

95.    With regard to cause of death, Dr. Wayne Ross stated "It is my opinion that the cause of death is Traumatic Brain Injury *accompanied by* strangulation and suffocation. There is also evidence of strangulation suffocation/chest compression." (emphasis added).

96.    This plain wording in cause of death opinion, as well as the remaining portions of the Report, do not imply imminence, as it is possible for individuals to succumb to a fatal injury hours or even days after its infliction.

97.    The Coroner's Report also lists the place of injury as "unknown" and the time of injury as "unknown," even though the examiner would have received information from YCPD regarding when Dante had arrived at the hospital and

could have approximated the time of injury if it had been imminent or occurred after Dante had been seen at Rutter's with Bowie.

98.   On September 19, Hower interviewed Bowie a second time.

99.   Bowie stated to Hower that Dante had not been acting like himself on the day of his choking incident.

100.   Bowie informed Hower that he had observed Dante's eyes roll back into his head while sitting in the car with Mullinix, had seen Dante spontaneously pass out on two separate occasions, and that, while at Peiffer's house, Dante had continuously gagged both while eating and afterward.

101.   Bowie also stated that, at one point in the day, Mullinix and Dante had remained in the car while Bowie ran into stores, and when he returned to the car, he had noticed tears in Dante's eyes and a red mark on his face that had not been visible before he had left Mullinix and Dante alone together.

102.   Bowie additionally told Hower that he had heard a thump and a muffled cry while Mullinix was downstairs alone with Dante in Peiffer's bathroom while Bowie had been upstairs on the phone with the mother of his child, Holly Carson.

103.   When Bowie had checked on them, thinking that Mullinix or Dante had broken something, he witnessed Mullinix quickly put something appearing to

18

be makeup into her bag, before she abruptly claimed that she was suffering a migraine and had to go to the Hospital "out of the blue."

104.  In fact, multiple times throughout this interview, Bowie told Hower that he had heard a thump when Dante and Mullinix were alone together in Peiffer's bathroom.

105.  Hower ignored the possibility that Mullinix had in any way injured Dante in Peiffer's bathroom prior to going to the emergency room for her reported migraine,

**Q:  Did you plan on killing him or did this happen?**
**A:  Please just stop. Please stop. You can't do this. Like you can't put this in my head. Don't put this on me. You are not going to put this on me. I don't know. I don't know what the fuck happened. I don't know.**
**Q:  It's on you.**
**A:  No, you can't.**
**Q:  It's on you as it can get. I just explained to you all of it.**
**A:  You can't. You can't put this on me. You can't put this on me because – no. Because – no. Like I said, there's a fuckin' reason why that bitch wanted to go to that fuckin' hospital that quick out of the fuckin' blue. A migraine. Get the fuck out of here. You know. There's no –**
**Q:  I am telling you –**
**A:  Even her sister, her mother –**
**Q:  Dante –**
**A:  That's the thing. Her –**
**Q:  —or Tyree, listen to me. I am telling you without any doubt at all, okay, that Leah did not kill Dante.**
**A:  She—honestly, I wouldn't – I wouldn't put it past her. Not intentionally. But, like I said, that –**
**Q:  I am telling you she didn't.**
**A:  Whatever that thump was that I heard when I was upstairs taking a shit, I – I am a hundred precent sure that scared her. I am a hundred percent. Because she never, never, ever said anything about going to –**

19

**Q:    Are you sticking with the thump story?**

106.    When Bowie attempted to tell Hower that he notice makeup smudged on Dante's bruises, Hower cut him off, stating, "You just listen to me at this point, okay, because I listened to your bullshit for long enough."

107.    Just as in his first interview, Bowie clarified to Hower that after dropping Mullinix off at the hospital, he had taken Dante to Rutter's, and before getting Dante out of the car, he noticed that Dante had fallen in the back seat and appeared to be shaking.

108.    Bowie described to Hower how he had spent time standing outside the vehicle observing Dante before assisting him out of the vehicle.

109.    Bowie again recounted the details of Dante's medical emergency and explicitly instructed Hower to check both his clothes and Dante's, as well as the driver's side of his vehicle, for cookie residue and traces of makeup.

110.    With regard to Dante's cause of death findings, Hower told Bowie "And I have a doctor that's willing to say in a very, very, very brief amount of time from the time he went out, okay, from the time he was stranged, okay – the time these injuries happen is only a brief time before, okay, he would have completely lost consciousness."

111.    However, this contradicted Dante's Post Mortem Report and the Coroner's Comprehensive Report of Death Investigation, which explicitly stated

20

that the time of injury "unknown," also stating the place of injury as "unknown,"

and failing to include any estimates or approximations.

112.   Nonetheless, Hower continued to harangue Bowie, stating,

**Q:    "—we are clear, we are not talking about instant strangulation here.**
**A:    No, no, no.**
**Q:    I mean, we are not talking about prolonged strangulation where this happened even hours before.**
**A:    No.**
**Q:    Okay, we are talking about it happened when he was in your car.**
**A:    No, no, no it didn't. It couldn't have. Because, like I said, there was a reason why he could not get that burger down and he threw up that burger. There's a reason. I have seen him eat.**
**Q:    I am telling you that's completely bullshit and the doctor is willing to say that's complete bullshit.**

113.   Although Hower continued to press this erroneous factual predicate

throughout the investigation and prematurely dismissed any possibility that Dante

experienced a lucid interval between injury and death, the post-mortem report

contained no such conclusion, and there was no support for the claim that Dante's

death had to have occurred imminently.

114.   Strangely, even though Hower charged Bowie with first-degree

murder, he stated to Bowie during the interview, "So we are agreeing that you

didn't plan to kill him?" to which Bowie responded, "I would never think about

killing him."

21

115.    Later Hower told Bowie, "There's two options…" "…You planned to kill Dante or you snapped and something happened. So how do you want it to play out."

116.    By this point in the investigation, i.e., when Hower was interviewing Bowie for the second time, YCPD had already obtained the following evidence: a search warrant for, and possession of, Bowie's vehicle; search warrants for the cell phones and Facebook accounts of both Mullinix and Bowie; multiple articles of clothing; York Hospital surveillance footage; a disc containing photos of the vehicle; Dante's WellSpan Health Summary; two unfilled prescriptions; Mullinix's day planner containing a pamphlet for anger management; receipts from Burger King, Citizens Bank, and Walmart; and swabs of tan/red residue labeled as "possible mucus" taken by Hower from the driver's side of Bowie's vehicle.

117.    The timestamps on the receipts corroborate Bowie's timeline of events, the unfilled prescriptions confirm CYF's account of Mullinix's medical negligence, the WellSpan Health Summary outlines Dante's documented injuries while in Mullinix's care, with the swabs of "possible mucus" having been personally retrieved by Hower, all aligning with Bowie's claims that cookie had been expelled from his nose while Bowie was attempting to administer life-saving treatment.

22

118. Mullinix's Facebook messages to Bowie between September 1 through 6 include concerning statements made about Dante such as, "He's bein bad as fuck," "Shit is annoying hes fuckin wit his dick n whining," "getting on my last damn nerve," "N dante won't stop fuckin crying," "He cries worse than a fuckin newborn," "He always acts really bad banging his head screaming n throwing shit" and calling Dante "nasty."

119. Additionally, Mullinix's messages to Bowie stated that she "got bitched at a lil bit ago" when she left Dante in the high chair, and that "…not like anyone here can deal with the crying 24/7 ppl already complained."

120. On September 2, Bowie asked Mullinix when Dante had gotten the lump on his head and she affirmed that it had happened at the Shelter.

121. Additionally, Mullinix claimed to Bowie that Dante "keeps hitting himself," "…this kid has been banging his head to much n has a bruise on his forehead" and stated that Dante bangs his head when Bowie is not around.

122. Mullinix also messaged, Bowie referencing Dante's relationship with her abusive former paramour, stating, "I told [CYS] hes still traumatized from him witnessing [the former paramour] fuck his own kids up he always run away crying and screaming," adding, "the whole lot of them abuse their kids hitting them in the back n shit."

23

123.   Bowie replied to her by confirming that he had heard the same things from Mullinix's sister, mentioning that he knew the former paramour's whole family would hit Dante and make him sit on the toilet for hours, and Bowie further urged Mullinix to focus on Dante and remarked that he was glad he made the call for them to get into the Shelter.

124.   Moreover, expressing concern for Dante's well-being, Bowie messaged Mullinix that she need to "make sure u have diapers everywhere you go he was in that piss and shitty diper for a couple hours you got to make sure you clean that shit and make sure you change him smh," and added, "Yeah you got to make sure that shit clean and he needs a car seat from now on or I cant let y'all in my car." With regard to Dante's severe penile infection, Bowie reminded Mullinix that his infection was concerning when they first met and she changed Dante in front of Bowie, and mentioned seeing scabs on him when Mullinix brought Dante to Bowie's mother's house to shower.

125.   Mullinix also expressed her extreme frustration to Bowie with statements such as,

> "I can't deal with it anymore like frfr he had all his fuckin medicine and all he does is cream n cry,"
> "we'll be lucky if we don't get kicked out cuz all he does every night is cry all fuckin night n won't stay out of his fuckin diaper,"
> "I can't stand another sleepless night n a kid crying n screaming in pain,"
> "I'm exhausted got no sleep what so ever n I'm bout to snap."
> "Omg I haven't got any sleep he won't stop crying n fuckin screaming I can't deal with this fuckin shit."

24

"I can't keep going on no sleep either it's making me have mental break downs."
"No he wont hes better off in the hospital." in response to Bowie assuring Mullinix that Dante would get better.
"Ur gonna have to find a way to bring his medicine I can't take this constant crying him taking his diaper off in bed n his dick bleeding."
"I'm bout to pawn dante on someone for a lil bit cuz hes actin up to fuckin much,"

126. Mullinix had also sent messages to a third party, stating "The Dr is supposed to come in sometime to let me know where we go from here…I'm afraid to know," further stating, "My only baby n I fucked up big time."

127. The messages sent to Bowie also contained a photo of Dante taken prior to Mullinix claiming she had a migraine, with visible marks on Dante's neck.

**B.   HOWER'S MATERIALLY DEFECTIVE AFFIDAVIT AGAINST BOWIE.**

128. On September 19, 2018, Hower swore out an affidavit of probable cause ("Affidavit") in support of a criminal complaint filed in Magisterial District Court No. 19-2-04.  A copy of the complaint and affidavit are attached collectively as Exhibit A.

**1.   The Criminal Charges Against Bowie.**

129. Hower charged Bowie with two offenses,

- Count I – Criminal Homicide – 18 Penna. Cons. Stat. § 2501(a).

- Count II – Endangering Welfare Of Children – 18 Penna. Cons. Stat. § 4304(a)(1).

130. Under Count I Bowie was charged with both first-degree and third-degree murder.

131. Criminal homicide constitutes murder of the first degree when it is an "intentional killing."  18 Pa. Cons. Stat. § 2502(a).

132. "Intentional killing" must be perpetrated "by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing." 18 Pa. Cons. Stat. § 2502(d).

133. Under Pennsylvania law, a conviction of murder of the first degree requires proof of "specific intent to kill … and that the killing [be] done with deliberation."  *Com. v. Simpson*, 754 A.2d 1264, 1269 (Pa. 2000).

134. As a result of this charge, Bowie was taken into custody and was ineligible for bail pending trial.  See Pa. Const. art. 1, § 14.

135. Hower also charged Bowie with murder of the third degree.

136.  Murder of the third degree retains the common law requirement of "malice aforethought."  *Com. v. Packer,* 168 A.3d 161, 168 (Pa. 2017).

137. Such culpable malice is present when an actor not only has "particular ill-will, but [in] every case where there is wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty[.]" *Com. v. Frye,* 319 A.3d 602, 606–07 (Pa. Super. 2024), reargument denied (Sept. 24, 2024).

138.    For murder of the third degree, malice can be present "under circumstances where a defendant did not have an intent to kill, but nevertheless displayed a conscious disregard for an unjustified and extremely high risk that his actions might cause death or serious bodily harm." *Id.* (quotation omitted).

139.    The offense of Endangering the Welfare of Children requires the Commonwealth to prove the following,

> 1) The accused was aware of his or her duty to protect the child;
>
> 2) The accused was aware that the child was in circumstances that could threaten the child's physical or psychological welfare; and
>
> 3) The accused has either failed to act or has taken action so lame or meager that such actions cannot reasonably be expected to protect the child's welfare.

*Com. v. Delamarter*, 302 A.3d 1195, 1201–1202 (Pa. Super. 2023) (citing *Com. v. Bryant*, 57 A.3d 191, 197 (Pa. Super. 2012)).

140.    This offense requires proof of specific intent, and to be convicted under this statute, the Commonwealth must prove a knowing violation of a duty of care. *Id.* (citing *Com. v. Foster,* 764 A.2d 1076, 1082 (Pa. Super. 2000)).

## 2.    <u>Hower's Material Misrepresentations, Omissions, and Falsehoods.</u>

141.    The Hower Affidavit included deliberately and recklessly made material falsehoods and/or omissions such that probable cause would not have existed without them.

142.    Throughout the Affidavit, Hower intentionally omitted material facts tending to inculpate Mullinix or a third party and exculpating Bowie, that would reveal Dante's significant pre-existing health problems, facts which any reviewing jurist would have wanted to know when considering probable cause, and thereby obscured the lack of probable cause to accuse Bowie of Dante's murder.

143.    Sentence #1: **"On 09/06/2018 at approx. 2230 hours York City police were made aware of the unresponsive juvenile victim, D.M. DOB 09/21/15 at York Hospital."**

144.    Notably, there is no assertion in the Affidavit or in the corresponding Incident Report that YCPD's initial dispatch call concerning any wrongdoing by Bowie.

145.    Moreover, Hower omitted from the Affidavit the fact that YCPD had had recent prior dealings with Dante and Mullinix, as they had received two ChildLine reports on September 5 from WellSpan and the Shelter documenting bruises on Dante and reporting Mullinix's refusal to treat his medical condition.

146.    Sentence # 2: **"He was brought into York hospital by the defendant unresponsive, which was confirmed by York hospital surveillance."**

147.    Hower here implicitly acknowledged that Bowie, not Mullinix, had sought emergency medical treatment for Dante, and omits the fact that the

28

surveillance footage corroborates Bowie's stated timeline of events, as told to Hower in both interviews.

148. Sentence #3: "**The defendant immediately fled from the hospital after he transferred the victim to hospital staff.**"

149. Hower made a material mischaracterization of Bowie's departure as flight, despite the fact that Bowie had not been asked to remain at the hospital, had not been identified as a suspect, and had not even been requested to provide a statement at the hospital when turning Dante over to medical staff. *Cf.* 18 Pa. Cons. Stat. § 5104.2(a) ("A person commits an offense if the person knowingly and intentionally flees on foot from a public servant *attempting to lawfully arrest or detain that person.*") (italics added).

150. Hower's suggestion of criminality by Bowie tainted what should have been a balanced and straightforward recitation of facts presented to the magisterial district judge.

151. At the same time, Hower's wording in fact demonstrates that Bowie *voluntarily* rushed Dante to the hospital and transferred Dante to hospital staff in an effort to save his life, conduct which is not indicative of criminality.

152. Sentence #4: "**On 09/07/2018 at approx. 0954 hours the defendant came into YCPD headquarters to be interviewed by this detective.**"

29

153.   While the word "came" merely implies that Bowie was not escorted, the sentence omits a critical fact: Bowie had voluntarily called officers approximately thirty minutes earlier and had explicitly requested to come in *immediately*.

154.   Hower's consistent omissions of exculpatory details obscured Bowie's cooperation and voluntary assistance in the investigation and in his efforts to save Dante's life.

155.   Sentence #5: **"During the interview the defendant admitted that he was the only one in care of the victim when he stopped breathing."**

156.   Hower's use of the word "admitted" – a word suggesting culpability by Bowie – actually reflects that Bowie had been forthcoming, again demonstrating his cooperation in the investigation and efforts to save Dante.

157.   It is true that Bowie had been "the only one caring for Dante" during his medical emergency, but Hower omitted the fact that Mullinix had specifically asked Bowie to leave with Dante while Mullinix remained at the hospital for her own health concerns.

158.   Moreover, Hower used the words "stopped breathing."

159.   First, nothing in this sentence, or the entirety of the Affidavit, explained how, why, when, or if, Bowie had caused Dante to stop breathing.

160. Secondly, Hower omitted exculpatory facts that may explain why Dante stopped breathing, specifically that Dante had been experiencing significant ongoing medical issues in the days leading up to his medical emergency, including passing out, emesis of red vomitus, difficulty eating, and suffering from a severe penile infection.

161. These facts were known to Hower and were corroborated by numerous witnesses and documentation prior to September 19, tending to negate the foundational allegation of Bowie's Affidavit that Bowie had intentionally (or even unintentionally) caused Dante harm.

162. The omission of any reference to the confirmatory statements of Bowie's timeline and Dante's pre-existing medical condition constituted a prejudicial withholding of materially exculpatory information from the reviewing magisterial district judge.

163. Sentence # 6: **"He advised that he fed the victim animal crackers in the area of the 700 block of N. George St."**

164. Further, it is demonstrated that Bowie, not Mullinix, had been the one caring for Dante, specifically by feeding him.

165. Moreover, it is specified that Bowie fed Dante animal crackers.

166. However, Hower omitted that Bowie's animal cracker testimony had been corroborated by Mullinix, who had provided him the animal crackers.

31

167.    Hower also omitted a critical portion of Bowie's statement concerning the animal crackers, specifically that Dante had cookie had been expelled from his nose while Bowie was attempting to administer life-saving treatment, and that Hower had personally collected swabs of a tan/red substance labeled "possible mucus" from the steering wheel and driver side door of Bowie's vehicle.

168.    Sentence #7: **"He then realized the victim was not breathing in the area of S. George at E Maple. (500 block of S. George St.), so he rushed the victim to the hospital."**

169.    Hower here again referred to Dante as a "victim," yet the Affidavit lacks any indication of how Dante had been victimized by Bowie, nor does it offer any theory as to why Dante had stopped breathing.

170.    Notably, Hower used the word "rushed," again underscoring Bowie's care for Dante and desperate efforts to save his life.

171.    Ironically, just seven sentences into the Affidavit, Hower has repeatedly used wording implying Bowie's innocence, yet those implications are concealed in a cascade of materially misleading statements and omissions.

172.    Hower omitted the material fact that while Bowie had been rushing to the hospital with Dante, he had been in direct communication with Mullinix via real-time audiovisual communication while rushing to the hospital, and that Mullinix had witnessed Bowie attempting to perform life-saving measures.

173.   Sentence #8: "**He also advised that from the time the victim's mother was dropped off at York hospital at approx. 2030 hours until he rushed the victim to the hospital, no other adults were present that could have caused these injuries.**"

174.   Once again, Hower concealed facts critical to Mullinix's culpability, further omitting material exculpatory evidence that undermined his assertions against Bowie.

175.   First, Hower omitted the fact that Dante had been suffering from multiple injuries that had already been documented in Dante's medical records and CYF investigatory notes prior to September 6, undermining suspicion that Bowie had been the adult who had caused Dante's injuries.

176.   Secondly, Hower omitted the fact that medical personnel informed officers that Dante had *acute and subacute* subdural bleeding, meaning symptoms and incapacitation.

177.   Such symptoms can develop hours or even days after initial trauma, according to easily obtained online medical literature.

178.   Finally, Hower ignored Bowie's testimony that he had heard a bang and a muffled cry shortly before Mullinix requested to go to the hospital, a timeline consistent with the development of Dante's acute and subacute subdural bleeding and providing a plausible explanation for when the fatal head injury occurred.

179. Sentence #9: **"On 09/07/2018 at approx. 1100 hours detectives served a search warrant on this vehicle and observed that there were no animal crackers present anywhere in the vehicle."**

180. Such statement is a falsehood and directly contradicted by evidence personally obtained by Hower.

181. Technically, Hower had not located animal crackers in Bowie's vehicle, but he had been told by Bowie of the residue on Bowie's pants and would locate animal crackers in Dante's diaper bag when he searched Peiffer's residence *the day after the Affidavit was sworn out.* Yet Hower had made no effort to amend the Affidavit, leaving his unamended Affidavit filed with the magisterial district court as the putative basis for probable cause.

182. Moreover, although Hower did not find physical animal crackers in Bowie's vehicle, Hower personally swabbed and collected a tan/red substance labeled "possible mucus," from multiple areas around Bowie's driver's seat on September 10, three days after the incident and nine days before the Affidavit had been sworn out, consistent with Bowie's account that Dante had been expelled from his nose while Bowie was attempting to administer life-saving treatment.

183. In light of these facts, Hower's statement that there were "no animal crackers present anywhere in the vehicle" constitutes a material falsehood and was consequentially misleading to the reviewing magisterial district judge, if not

initially, at least subsequently as his investigation went on to confirm Bowie's account of animal crackers having been consumed in the car.

184.    Sentence #10: **"The defendant also made statements about being at Rutters #15 at 2125 Susquehanna Trail in York after leaving the hospital."**

185.    **Hospital footage showed Bowie drive away from the Hospital with Dante at approximately 8:30; Rutter's #15 is about 4 miles from the Hospital.**

186.    Sentence #11: **"Detectives viewed surveillance and observed the defendant and victim together at approx. 2045 hours."**

187.    Again, the footage corroborates Bowie's account of events in his interviews, placing him at Rutter's roughly fifteen minutes after dropping off Mullinix.

188.    Omitted from the affidavit is any mention that Rutter's security video shows Bowie staring into the back seat before assisting Dante from the vehicle.

189.    This detail aligns with Bowie's statements that he had noticed Dante to have fallen over and was appearing to shake, further supporting the consistent statements from Bowie and Mullinix that Dante had been experiencing medical episodes that day and in the days leading up his medical emergency.

190.    By omitting this fact, Hower again failed to present exculpatory evidence to the reviewing magisterial district judge to support Bowie's account

35

that Dante had been suffering from pre-existing medical issues which likely had contributed to him stopping to breathe while in Bowie's care.

191. Sentence #12: **"The victim appears to be healthy and able to walk on his own."**

192. Such statement is materially misleading.

193. The Rutter's footage is extremely grainy, having been shot from a significant distance away from where Bowie exited the car and spent time observing Dante's actions through the window of the backseat before the pair ultimately walked to the building.

194. Bowie's body also in part obstructs Dante from the camera's view.

195. Hower's labelling of Dante as "healthy" based on such grainy and unclear video was unsupported by the video itself, especially given Bowie's statement to Hower that Dante had experienced ongoing serious health issues which was the very reason that Bowie had taken an abnormally long time standing by the back door of the vehicle, observing Dante's movements through the back window.

196. Hower used the word "healthy" *specifically*, despite Bowie expressly refuting that description during his interview on September 7, 2018, stating, "I don't want to say he was healthy."

197.   Yet more egregiously, Hower's statement ignored the copious evidence contained in CYF reports, medical records, and eyewitness testimony establishing that Dante had not been healthy in the days leading up to September 6, turned a blind eye to Mullinix's suspicious explanations for Dante's bodily bruising, and failed to provide a factual predicate to the reviewing magisterial district judge upon which the Court could make a fair determination as to the existence of probable cause.

198.   Hower's characterization of Dante as "healthy" blatantly concealed corroborated evidence that Dante had been experiencing difficulty eating, vomiting, recurring fevers, a severe infection, frequent falls, and repeated head-banging, including twice on the day of the incident.

199.   Hower, however, withheld this materially exculpatory evidence from the issuing magistrate's review, intentionally omitting information actually known to him at the time he swore out his Affidavit.

200.   Sentence #13: **"The defendant stated after he left Rutters he went to 118 Lexton Drive in York."**

201.   Hower omits the fact that Bowie, Dante, and Mullinix had already been at 118 Lexton Drive, home of Bowie's temporary roommate, Laci Peiffer, earlier in the day, where Dante had experienced vomiting, gagging, and difficulty

eating, and where Bowie had heard a loud thump and muffled cry while Mullinix was alone with Dante.

202.   As such, Hower omitted materially exculpatory details that would explain why Dante had suddenly stopped breathing in Bowie's care and would mitigate any inference that Bowie had harmed Dante intentionally or unintentionally in the brief two hour time frame that Mullinix was not physically present with them.

203.   Sentence #14: **"The defendant was interviewed again on 09/19/18 and advised that he fed the victim animal crackers in the area of Lexton Estates and the victim stopped breathing a short time later."**

204.   Hower noted in this sentence that Bowie had stated that he had fed Dante animal crackers "in the area of Lexton estates," contrasting with his earlier statement in Sentence #6 that Bowie had fed Dante "in the area of the 700 block of N. George St."

205.   Although Hower attempted to draw attention to this alleged discrepancy in his Affidavit that consisted of less than one page, the two referenced locations are only approximately two miles apart and Bowie had been in transit at the time.

206.   Statements containing such minor inconsistencies are common following traumatic events and certainly not an independent basis to support a

murder charge nor reason for Hower to exclude mention of Dante's pre-existing significant medical history nor undermining of Bowie's otherwise fully consistent and corroborated account.

207. The fourteenth sentence concludes "…and the victim stopped breathing a short time later."

208. Such statement simply reflects the sequence of events and contains no allegation of foul play, instead highlighting the correlation between Dante eating animal crackers and losing his ability to breathe.

209. Sentence #15: "**On 09/18/2018 an autopsy was conducted of the victim at Dauphin County Coroner's office.**"

210. Sentence #16: "**The cause of death was ruled a homicide from a traumatic brain injury, accompanied by strangulation and suffocation.**"

211. The fact that Dante's death had been ruled a homicide did not automatically support the conclusion that Bowie had murdered Dante, nor that Dante's fatal injuries could not have been caused prior to the time that Dante was alone with Bowie, especially in light of the evidence documenting Dante's abuse and neglect prior to September 6, while he was in Mullinix's care.

212. In fact, as explained *infra,* Hower would later go on to charge Mullinix criminally for her neglect and mistreatment of Dante, despite the fact that his Affidavit made no reference to Mullinix's harmful mistreatment of Dante.

213.    Yet, while knowing the circumstances of the charge he would later file against Mullinix, he intentionally omitted any reference to Dante's severe medical conditions and Mullinix's felonious criminality in her mistreatment of Dante.

214.    Moreover, the very first assessment of Dante's brain injury at York Hospital on September 6 revealed that Dante was suffering from acute and subacute subdural bleeding, meaning the traumatic brain injury could have been sustained hours or days prior to Dante being brought to the hospital.

215.    Also omitted from the Affidavit was the fact that the second page of the Coroner's Post Mortem report cited Dante's "acute and sub-acute bilateral subdural hematomas" and stated numerous times that Dante had injuries and bruises *in various stages of healing* suggesting mistreatment predating Dante's time with Bowie on the night of September 6.

216.    Sentence #17: **"Based on this information I respectfully request that a warrant be issued for the defendant."**

217.    Sentence #18: **"Venue was approved by the York County district attorney's office as well as NYCRPD."**

218.    Throughout the Affidavit, Hower fails to articulate any *actus reus* necessary to support charges of first-degree or third-degree murder or endangering the welfare of children.

219.    The Affidavit does not identify any conduct by Bowie that caused Dante's fatal injuries, nor does it describe how those injuries were inflicted, as it names no weapon, no instrumentality, no mechanism of injury, and no location where the alleged assault occurred.

220.    Instead, the Affidavit repeatedly corroborates the fact that Dante had stopped breathing with the fact that Bowie had fed him animal crackers.

221.    Rather than setting forth facts demonstrating that Bowie engaged in any unlawful act, the Affidavit merely states Dante's cause of death findings, then asserts causation by Bowie.

222.    The only factual assertion connecting Bowie to Dante's injuries is that Bowie transported Dante to the hospital and was present when Dante became unconscious.  Presence and transport, without more, do not constitute a criminal act.

223.    Also omitted was the substantial exculpatory evidence demonstrating that Mullinix had an extensive history of abuse and neglect toward Dante and that she, not Bowie, was the far more likely source of injuries that would have led to the medical distress Dante suddenly suffered while in Bowie's care.

224.    By equating mere temporal proximity with criminal conduct, and omitting substantial evidence of Mullinix's documented history of criminal neglect of Dante's health despite ongoing, persistent manifestations of alarming symptoms,

41

the Affidavit presented a materially distorted account of the background leading up to Dante's medical distress on the night of September 6 and omitted material information about Mullinix's likely contribution thereto.

225.   The reviewing magisterial district judge was not informed that another caregiver had both repeated opportunity and a documented pattern of contributing to Dante's poor medical state.

226.   By withholding such material facts, the Affidavit obscured the existence of an alternative criminal actor – Mullinix or a third party associated with her – and falsely suggested that the required criminal act could only have been committed by Bowie, thereby misleading the reviewing magisterial district judge.

227.   Likewise, Hower's Affidavit against Bowie also failed to articulate any *mens rea* necessary to support charges of first-degree murder, third-degree murder or even child endangerment, stating no plausible motive Bowie might have had to harm Dante, a child he had known for approximately two weeks.

228.   Hower ignored numerous statements received from =multiple case witnesses that Bowie was not violent, had never mistreated Dante, and that Mullinix had in fact been neglectful toward Dante even in the face of the serious health problems Dante was experiencing.

229.   The Affidavit sets forth no facts suggesting hostility, frustration, prior mistreatment, or any circumstance from which a malicious or knowing intent could reasonably be inferred.

230.   Not only did Hower wrongly attribute the cause of Dante's fatal injuries to Bowie's time with Dante rather than Mullinix's criminal neglect of Dante's health, he further concluded, without factual support, that those injuries must have been inflicted *intentionally* by Bowie.

231.   The Affidavit contains no facts advising the reviewing magisterial district judge of the reasonable possibility that any injury occurred as a result of Dante's pre-existing medical difficulties, including handling the intake of food, whether during Bowie's panicked attempts to perform life-saving measures or through some other unintended event while Dante was in his care.

232.   In spite of the mountain of evidence that Dante had been chronically in poor health, Hower nevertheless averred in his Affidavit that Dante appeared "healthy" while walking into Rutter's with Bowie – a statement which if perhaps literally true in Hower's mind, intentionally obscured the tremendous history of medical difficulties Dante had suffered from and which had been aggravated by Mullinix's criminal neglect of Dante's condition.

233.   In fact, it was far more probable that Mullinix, who had repeatedly demonstrated indifference and even hostility toward Dante and had been solely

43

responsible for him during numerous documented incidents of neglect and suspicious injuries, was more likely a culpable party, if anyone was to be blamed for Dante's distress while eating the animal crackers on the night he was rushed to the hospital.

234. In fact, the evidence of Mullinix's criminal neglect of Dante was so overwhelming that even Hower, who had been promising Mullinix so much tender treatment when interviewing her, was eventually compelled to charge her with endangering the welfare of a child for medical neglect.

235. Mullinix would in fact go on to plead guilty to the charge.

236. But Hower never withdrew the charge against Bowie, despite having materially changed his position vis-à-vis Mullinix as a criminally neglectful parent with respect to Dante's health.

237. The case against Leah Mullinix was ultimately docketed at York County Court of Common Pleas as *Commonwealth v. Leah Lynnette Mullinix,* CP-67-CR-0000810-2019, and Mullinix in November of 2023 would go on to plead guilty to a felony of the third degree and be sentenced to five years of probation.

238. The weak inferences that Bowie must have caused Dante's injuries simply because 1) Bowie was alone with Dante at the time of Dante's emergency, and 2) Dante's death was ruled a homicide, are materially mitigated and cast into doubt by the voluminous exculpatory evidence omitted from the Affidavit; had the

reviewing magisterial district judge been presented with the full record, these two isolated details alone would have been insufficient to establish probable cause.

239. Regarding Endangering the Welfare of a Child, the Affidavit actually negates the inference that Bowie violated a duty of care to Dante.

240. The Affidavit establishes that Bowie "fed" Dante, "realized [Dante] was not breathing," then "rushed" Dante to York Hospital and "transferred [Dante] to hospital staff," stating that "no other adults were present," including Dante's mother, Mullinix, who had already been at the hospital for her own ailments.

241. Omitted from the Affidavit is the exculpatory fact that Bowie had immediately notified Dante's mother of the emergency and had engaged in real-time audio-visual communication with the mother, all while attempting to administer life-saving measures to Dante while rushing to the hospital, a material fact any reviewing jurist would want to know when weighing probable cause.

242. The full picture shows that Mullinix sent Dante away with Bowie so Mullinix could attend to her own headache at the hospital, rather than keeping Dante with her at the hospital to address any recurring medical issues that might arise, such as had arisen earlier in the day.

243. Bowie drove Dante around that afternoon, took him to stores, entertained him with music, and fed him.

45

244.    Upon discovering Dante had stopped breathing while eating animal crackers, Bowie immediately notified Mullinix, attempted life-saving measures, and rushed Dante to the hospital.

245.    None of this was conveyed in Hower's Affidavit, despite Bowie having acted as a reasonable adult would under the circumstances, and the actual history of the matter – omitted from Hower's Affidavit – negated Hower's claim that Bowie had violated his duty of care to Dante, whether knowingly or unknowingly, much less been the monster that Hower attempted to portray him as in the Affidavit.

246.    Despite the lack of good faith evidence against Bowie and rather than waiting until the investigation produced more evidence, Hower prematurely and unjustifiably swore out an Affidavit of Probable Cause against Bowie and continued to overlook Mullinix as a suspect.

## C.    DISSIPATING PROBABLE CAUSE THROUGHOUT THE INVESTIGATION.

247.    On September 20, 2018, Hower interviewed Holly Carson ("Carson"), the mother of one of Bowie's daughters.

248.    Carson confirmed that Bowie had called her September 6 at 7:02 p.m., 7:44 p.m. and 9:46 p.m. to speak to their daughter, adding that she had not been on good terms with Bowie, "But I can honestly say he was good to the kids."

46

249.   When Hower asked Carson if she thought Bowie was capable of harming Dante, Carson responded, "To be honest, I don't." and told Hower that Bowie had been a present father and that she had trusted him around his children.

250.   Carson stated that she had never feared for her daughter's life around Bowie.

251.   On September 21, 2018 Hower interviewed Peiffer, Bowie's friend and temporary roommate.

252.   Peiffer told Hower that she did not believe Bowie harmed Dante, informed him that Mullinix had ties to gang members, and pointed out that Bowie was the one who had gotten Mullinix and Dante into the Shelter.

253.   Peiffer also told Hower, "I just hope that there's hard evidence. Because I have known [Bowie] for a long time. And I don't think he would do this to a child."

254.   Verbally dismissing another witness vouching for Bowie and overlooking Mullinix's red flags, Hower replied, "…his story is completely bullshit" and "… I am not saying that Dante's mother was mom of the year. But she didn't kill him."

255.   Peiffer pleaded with Hower to go through the evidence "thoroughly, thoroughly, thoroughly," urged him to check Mullinix's messages with Bowie, and continued to warn him about Mullinix, pointing out that Mullinix was not

47

emotional at all and that Mullinix's sister even believed she had been responsible for Dante's death.

256. Hower replied to these warnings by stating, "no one else caused his death but [Bowie]," asserting that "it's completely impossible" that Mullinix was culpable.

257. Peiffer also voluntarily allowed Hower to search her home and showed Hower Dante's diaper bag located in Bowie's room.

258. Inside the diaper bag, Hower found and logged a Teddy Graham and Barnum's Animal Crackers, further corroborating Bowie's account.

259. In an effort to preserve evidence, Peiffer had kept a bag of Teddy Graham cookies that Bowie had thrown away in frustration after taking Dante to the hospital.

260. Peiffer's friend, Erika Bryson, was present in Peiffer's home during Hower's search of Peiffer's house.

261. Bryson told the jury at the time of trial that Peiffer "was trying to get the detective [Hower] to follow her to show evidence " multiple times during the search but Hower refused to follow her.

262. In an effort to preserve evidence, Peiffer kept a bag of Teddy Graham cookies that Bowie had thrown away in frustration after taking Dante to the

48

hospital, but when she tried to give the evidence to Hower, he said that he did not need it because Bowie was guilty.

263. At trial, Peiffer testified that when Hower found out she had subsequently given the Teddy Graham bag to Bowie's defense attorney, Hower threatened to charge her with evidence tampering.

264. On September 24, 2018, Hower visited Master Staffing and positively confirmed Bowie's claims that Bowie had picked up his check on September 6.

265. On September 27, 2018 YCPD interviewed Megan Moore from CYF, who revealed more disturbing details about Dante and Mullinix's relationship.

266. Moore told Pitts that CYF first received an agency referral on September 1 from Shelter staff with concerns that Mullinix had been neglecting Dante.

267. When Moore met Dante on September 2, she noticed he was in "obvious discomfort" and was scooching around in a wet diaper.

268. She had also observed scratches on his face and a "significant bruise" on the right side of his forehead, as well as marks on his right arm and leg.

269. Mullinix excused Dante's injuries, claiming that Dante must have transferred his penile infection to his face, the marks on his body were just mosquito bites, and that Dante had been banging his head a lot.

49

270.    Moore also noticed that Dante had patches of hair missing, to which Mullinix replied that Dante had gotten a razor while she was driving and carved out patches of his own hair.

271.    Moore told Pitts that Mullinix was not affectionate with Dante and that Mullinix said she was frustrated with Dante.

272.    Moore noted that she thought it was important for Mullinix to work with parenting services to address these issues.

273.    Additionally, Moore stated that a Nurse Practitioner who had evaluated Dante, NP Billings, had asked Moore if CYF had plans to place Dante into care, had informed Moore that Dante acted differently around her than when he was with [Mullinix], and had opined to Moore that there were indications of "trauma or neglect."

274.    Moore also stated that, in June, Mullinix was involved with another CYF investigation in Gettysburg, and that reports were made that Mullinix would tell Dante to "fuck off" and get away from her.

275.    During this interview, Moore confirmed photos of Dante's injuries taken by her on September 2, and Pitts showed Moore a photo of a bite mark found on Dante's body that appeared to be the "size of a kid's mouth."

276.    As lead detective, Hower was undoubtedly aware of the September 27 interview with Moore, which included the bite mark, Dante's injury history,

50

extensive Child Services involvement with Mullinix, and Mullinix's weak explanations for Dante's numerous pre-existing physical problems prior to Bowie driving around with him on September 6.

277. On October 2, Pitts interviewed Marsha Forbes from CYF who repeated what she had told YCPD on September 9, that Dante had hair missing and scabs on his face when she saw him on the morning of September 2.

278. As a result of the ChildLine reports against Mullinix, Forbes had been tasked with driving Mullinix and Dante to WellSpan Express care at approximately 9 a.m. on September 6.

279. On October 3, Hower confirmed with Peiffer's neighbors that they had not heard or seen anything suspicious on the night of Dante's medical emergency.

280. On October 9, YCPD went to Denny's and confirmed that Bowie had gone into the restaurant around 2:30 p.m. on September 6, further corroborating Bowie's account of events.

281. On October 10, Pitts interviewed another CYS employee, Dakota Mitzel, who stated that she intervened after the Shelter reported that Mullinix had not been giving Dante medication for his infection.

282. Additionally, Dakota Mitzel informed officers that when she had seen Mullinix and Dante on September 4, Dante had a bruise on his head, was missing hair, and had a noticeably full diaper.

283. On October 15, Hower interviewed Mullinix for a second time, almost a month after swearing the Affidavit against Bowie.

284. Although still in the investigatory stage of the case, Assistant District Attorney Murphy stated to Mullinix that she "will be a witness going forward," and explained that the upcoming preliminary hearing is "…just where we show the judge kind of our very limited evidence that shows we have enough to charge [Bowie]."

285. Nonetheless, Hower administered *Miranda* warnings to Mullinix, immediately stating afterward, "Saying that, okay, wholeheartedly I know that you are not the one that killed Dante. Okay."

286. During the interview, Hower made offers to Mullinix that he would see about getting her a cell phone and suggested that Mullinix could text him if she needed money.

287. Mullinix revealed that on the night of September 5, 2018 Dante had cried all night at the Shelter due to extreme pain from the severe infection on his penis.

52

288.    In an effort to explain why she delayed seeking medical treatment for Dante, Mullinix claimed that she had not noticed Dante's condition until a few days prior to his traumatic accident.

289.    Mullinix also informed Hower that doctors at Hershey Medical Center told her Dante had a wrist fracture that he sustained a "couple weeks" before his incident,  and admitted, "I didn't even know anything about that".

290.    Immediately after Mullinix's admission, Hower told Mullinix that he and she had mutual respect for each other, emphasized that he was not pointing the finger at her or saying she was a bad mom, and added that that he wholeheartedly believed that Bowie had killed Dante.

291.    Just as she did in the first interview, Mullinix again told Hower that she had left Dante's car seat in the back of her car, and added that she could not remember if she seat-belted Dante in, remarking, "I would get upset with Tyree because like he used a car seat – though he was getting to the point he was starting to be smart and actually knew how to take the straps off."

292.    At another point during the interview, after Mullinix had told Hower that she should have changed Dante's diaper more often, Hower stated, "Like I said, I know you didn't cause Dante's death."Mullinix also told Hower that it was Bowie, not her, who had taken Dante into Peiffer's bathroom, stating, "Then I started hearing like muffled crying and shit. And then I am back there, and he's

53

like – I was like, what the fuck are you doing? Nothing. He's just –just washing his hands. Like, you really – why is there muffled crying and shit, mother fucker," adding, "because when it's muffled, then you know their hands are like over their mouth."

293.   When Hower asked Mullinix if she had actually confronted Bowie, Mullinix clarified that she did not say those things to him, she was only thinking them.

294.   Initially, while explaining the muffled cry and thud noise in Peiffer's downstairs bathroom, Mullinix acknowledged that Bowie had in fact gone upstairs to use Peiffer's other bathroom at that time, but Mullinix later changed this narrative, stating that she had gone upstairs to use the bathroom and could not remember Bowie going upstairs while at Peiffer's house.

295.   After blaming Bowie for Dante's death, Mullinix added, "Even though he got out of his shell a little bit more. He was a bit more happy."

296.   During this interview, Mullinix also conceded that she had been aware of the bruises on Dante's back and legs, stating that Dante had caused the bruises on his head by banging his head against the wall.

297.   When Hower asked Mullinix if she had ever lost her temper with Dante, she replied, "I have never hit him in the face."

54

298.   Mullinix also stated that on September 6, she had asked doctors why Dante was not eating, and that they had attributed it to his severe infection.

299.   Mullinix also said that Dante had been reluctant to eat and gagged while they were at Peiffer's house later that day, and told Hower that Dante had not wanted to eat in the days before.

300.   Mullinix stated that on the night of September 6 she had left to go to the hospital around 7:00 p.m. for her migraine, although she did not typically go to the hospital for migraines.

301.   Mullinix's account that she had gone to the Hospital for a migraine around 7:00 p.m. matches the time frame Bowie stated he had been talking to Carson on the phone upstairs and is verified by Caron's statements that she talked to Bowie at 7:02p.m.

302.   Mullinix also told Hower that, about two weeks prior to Dante's incident, she had lived at a paramour's house and would leave Dante alone with him, and stated that she had seen the paramour smack Dante and that she had observed Dante with a bloody nose while sitting on the toilet.

303.   At this stage in the interview, Hower reiterated to Mullinix, "I know you didn't cause Dante's death[,]" yet later stated to Mullinix, "I know people are pointing the finger at you for some different stuff…But this isn't your fault, you know what I mean."

304. Additionally, Mullinix disclosed to Hower that she had used LA Contour foundation makeup and might have had it in her possession on the day of Dante's medical emergency, adding that sometimes she would play with Dante by rubbing her makeup brushes on him.

305. Although Mullinix stated in this October 15, 2018, interview that she had used "LA *Contour*" makeup, Hower logged into evidence "LA *Colors*" make up on February 13, 2019, nearly four months later and after Bowie's vehicle and clothing had already been swabbed for residue.

306. The interview concluded with Mullinix complaining to Hower about the Justice for Dante Facebook page, where her sister, Sarah, had been documenting Dante's long history of abuse, and Hower replied, "I know. I have looked at it."

307. On October 26, 2018, Pitts interviewed Nurse Practitioner Natalie Billings ("NP Billings").

308. NP Billings told Pitts that she had seen Dante and Mullinix on September 2, 2018 to examine Dante's "horrible, horrible, horrible rash, horrible rash," and to give him medication, as ordered by CYS.

309. With regard to Mullinix getting and filling prescriptions for Dante, NP Billings stated, "So there were multiple different stories. Nothing really made

sense. Nothing was very consistent," adding "[Mullinix] didn't seem to be very attentive to Dante's needs."

310.    During Dante's medical examination, Mullinix also had asked NP Billings to assess a "bump from a few weeks ago on his forehead," and NP Billings remarked to Pitts, "I think they wanted a well-check for that. And I'm like, okay. He was here last night. This isn't adding up."

311.    Regarding the significant bruise on Dante's forehead, NP Billings stated, "If it was acute, then usually that stuff happens in four hours of the injuries. This was days, weeks old."

312.    Additionally NP Billings stated to Pitts,

> **"So I immediately walked out of the room and like, Where is that Children & Youth worker? Like, why would they – I need to figure out why they brought this child in here from the shelter. And mom said they were in a domestic violence abuse case from the end of June in Gettysburg and that they had moved to the shelter and that they had been there. I don't know if that's true or not.**
>
> **So she gave me a couple of different stories. And then so I was like, okay, immediately this child is not going home with this mom until the SAFE nurse comes in for the exam.**
>
> **Because he was just – testicular lesions and rash and it – I have pictures that Dr. Turkewitz sent me after the fact. And I'm in like a mildly dark room, no bright lights. And all I really saw (inaudible) was this little old greenish bruise here and another bruise on his leg. But the rash was pretty much where I focused most of my time on."**

313.    NP Billings also stated to Pitts,

> **"So I called the pediatric hospitalist. I think it's Dr. Moden. I am not sure. I said, look, I have these huge concerns. A, This child has this rash for what mom says was a few weeks old.**
>
> **Oh, and his diaper was completely soaked and she said she just changed it before they came in. And they have been there for like an hour or two. There's no way. I mean, this kid wasn't eating enough to have this super saturated diaper. She's like, well, I changed him. Well, I need another one. After I examined him, we had to – I changed him because I don't know when he was changed last."**

314. NP Billings continued,

> **"And they have lots of pictures that they had taken the day that I had saw him.**
> **Because I insisted on SAFE seeing him. I really, really didn't want him to leave. And I thought (inaudible) there's no way they are going to let this child leave with the mom once they see that rash."**
>
> **But it was very concerning. He wasn't being well taken care of. There was this very affect with mom. Like there was just not a mother/child bond … between those two. And she seemed more annoyed with him and more into this boyfriend and really not taking care of him"**

315. Regarding Dante's medical visit on the morning of September 6, before Bowie had picked up Mullinix and Dante from the Shelter, NP Billings said, "And they did follow-up on Thursday just a few hours before he came into the ER with another nurse practitioner to see him. So I wasn't the past provider to see him. And from what I heard initially was that it looked as though his genitals were mutilated when he came in."

316.   Before the interview concluded, NP Billings expressed regret that she had not taken emergency custody of Dante on September 2, stating,

**"This was an extremely upsetting case for me. But I felt – and I even had mentioned it to Dr. Barrett, who is the QA committee, like I don't know what else I could have done.**

**And that's when I was able – I was enlightened that I could take emergency custody. I really thought that it was the pediatric hospitalist that had to do that.**

**I probably would have done that had I known. Just the gut – not that he was going to end up dead, but that he was not being cared for properly in shelter.**

**Q:     (Inaudible).**

**A:     Yeah. He was hungry. I don't know what he had been fed lately. And I didn't trust a word out of mom's face and she just looked at me like who cares, like real nonchalant. And I couldn't get an honest answer from her."**

317.   On October 29, Mullinix had a third, brief interview with Detective Ward.

318.   Ward asked if Dante had fallen or sustained any injuries while at Peiffer's house, and Mullinix told Ward, "He was crying one time when he took him into like the upstairs bathroom. But it's not – like he was covering his mouth. So it was like muffled. And when I went back there, it stopped. Like I didn't see it," conflicting with her account to Hower that Bowie took Dante in to the "downstairs" bathroom while she was upstairs.

319.   When Ward inquired more deeply into that event, Mullinix told Ward inconclusively that Dante "might have" been crying a little bit after that, she thinks the water was running, and claimed she did not know why Bowie would have taken Dante into the bathroom to wash his hands.

320.   On November 13, 2018, as part of the investigation, Detective Ward interviewed various Access Shelter employees about Mullinix and Dante's time at the Shelter from September 1 through September 6 only.

321.   First, Ward interviewed Denise Naylor, the residential case manager and welfare advocate of the Access Shelter, who confirmed that Bowie had never been in the Shelter with Dante and Mullinix.

322.   Consistent with documented Shelter reports, Naylor stated that Dante had been screaming "nonstop" in "excruciating pain" from his infection because Mullinix refused to fill his prescription despite CYS's assistance.

323.   Naylor also mentioned Dante's bald spots and  "marks all over his legs", noting that she intentionally asked Mullinix about his injuries, hoping CYS would document it in their report.

324.   Naylor informed Ward that Mullinix showed no empathy toward Dante, and stated that the night Dante had been flown to Hershey Medical Center, Mullinix returned to the Shelter and went to bed after her interview at YCPD headquarters.

60

325. Naylor also stated that Mullinix was prohibited from visiting Dante in the hospital without CYS present, and that on the day Dante passed away, Mullinix called the Shelter and asked if their attorney would represent her, telling staff that she wanted to be prepared.

326. Naylor also told Ward that staff wrote in the shift notes that Mullinix was more worried about police going through her phone than her son's wellbeing.

327. Naylor, who had worked for CYS for 20 years, concluded the interview by stating "[Mullinix] had a part in this. That's just how I feel."

328. Ward also interviewed Megan Bialouas, coordinator of residential services at the Shelter, who informed him she had been one of the employees who had decided to call ChildLine on Mullinix, as she had been "very reluctant to give the baby the medication."

329. Ward also interviewed five residential counselors, Lahadah Freeland, Mary Plummer, Melanie McDaniel, Simone McRae, Jennifer Eyler, and Marissa Young.

330. Freeland told Ward that other Shelter occupants expressed concerns about Mullinix and Dante's interactions, and stated "…there wasn't much of a connection there as you would think with a parent and child."

61

331. Plummer said she observed marks resembling herpes around Dante's face on September 5 and 6, and that Mullinix seemed to be emotionally detached from Dante.

332. McDaniel stated that Dante's behavior suggested a history of trauma, as he'd immediately plug his ears and hide his face when she would kneel down to talk to him and would simply lay on the floor dejected when he was upset, unlike normal toddlers who cry or scream.

333. McRae also noted the "disconnect" between Mullinix and Dante, and further added that she observed Mullinix with her back turned to Dante, preoccupied with her phone while he cried in pain. When Simone asked Mullinix if she was going to check on Dante, Mullinix said no.

334. Eyler told Ward she was troubled by Mullinix's distant and careless nature with Dante, noting that she had never witnessed Mullinix provide comfort to Dante, nor pick him up or hug him. She said that Dante frequently cried in pain due to his infection and Mullinix would tell him to be quiet.

335. Eyler reported Mullinix to ChildLine on the evening of September 1 because she "felt the situation was urgent."

336. Eyler also said that Bowie had been the one to pick up Dante's medication.

62

337. Young similarly stated Bowie had picked up Dante's medicine and paid for it and that Mullinix told her that she had met Bowie about two weeks ago and he had been very helpful.

338. Young told Ward, "It seemed like she was preventing him from getting the medication is really what it seemed like which was weird to me. I've never seen that before. I felt like she didn't want him to have it, and I don't know why."

339. Young said that she had offered Tylenol and ibuprofen for Dante about four or five times before Mullinix finally took it.

340. Young also offered to clean out the bathtub so Dante could sit in it to soothe his infection, Mullinix also declined this offer, despite the fact that Dante "smelled like he needed a bath very strongly." Young opined, "I did not feel that she was behaving to him the way a mother would normally behave."

341. Mullinix had also explained to Young that Dante had bald spots because he cut his own hair with a pair of scissors in the car, which contradicts her story to Moore that Dante had cut his hair with a razor.

342. Additionally, Young told Ward that on September 2, around 3 a.m or 4 a.m., "I had another client come down and tell me she had some concerns about noises she was hearing form [Mullinix] and Dante's room.

343.   Young informed Ward, "Everyone was concerned," but clarified, "there were a couple of us who were extremely concerned…that something just wasn't right," because "[Mullinix] was more concerned about her personal life than mothering."

344.   At this point, Hower had records of *numerous* interviews from witnesses documenting a pattern of Mullinix's neglectful and disturbing behavior toward Dante, further establishing strong likelihood of injuries to Dante pre-dating his time alone with Bowie on September 6.

345.   Additionally, a large portion of the injuries documented on Dante's body at Hershey Medical on September 7 were consistent with the injuries the Shelter staff and CYF employees stated that they had seen on him in their interviews with Hower and other YCPD officers.

346.   Yet Hower did nothing to amend the Affidavit he had filed in the magisterial district court.

## D.    PRELIMINARY HEARING.

347.   On December 12, 2018 Hower testified at the preliminary hearing before Magisterial District Court 19-2-04.  A copy of the 12/12/2018 Preliminary Hearing transcript is attached as Exhibit B.

348.   On direct examination, Hower misstated a material detail that Bowie had pointed to in his first interview.

64

349.   Hower told the court that Bowie had stated that Dante "fell in the Rutter's parking lot," adding, "I viewed that surveillance. The victim did not fall." *Id.* at 7.

350.   This misrepresentation falsely suggested that Bowie had lied about Dante falling on pavement and falsely asserted that the camera surveillance contradicted Bowie's account.

351.   Bowie had already explained to Hower in both interviews that Dante had fallen in the backseat while in the car and not in the parking lot; it was why Bowie had paused to watch the child through the vehicle's window before entering Rutter's.

352.   Hower also mischaracterized the Rutter's surveillance, stating, "in 2039 approximately, the defendant pulls up in his chevy Cruze, and the – gets the victim out of the back seat, who's walking on his own. They go inside the Rutter's. They leave then at approximately 2045 hours." *Id*. at 8.

353.   Hower completely omitted from his testimony reference to a period during the video that Bowie spent looking into the vehicle and observing Dante before getting him out of the car, exculpatory evidence further corroborating Bowie's account and the extensive record of Dante's recurring medical episodes, including losing and regaining consciousness.

354. On cross-examination, Hower again misleadingly recounted his observations of the surveillance footage: "I viewed the car pull up, the defendant gets out, and get the child out of the backseat," once again omitting the fifteen-second period, a significant portion of an otherwise very brief video, during which Bowie exited the car and closely observed Dante through the window before helping him out of the car. *Id.* at 17.

355. Again misrepresenting Bowie's statement, Hower falsely claimed that it was not until the "*second interview*" that Bowie clarified where Dante fell, adding that "on the first interview, he informed me that he fell out in the parking lot." *Id.* at 15.

356. However, multiple times during Bowie's first interview, Bowie had clarified to Hower that Dante did not fall "out of the car" at Rutter's; instead, Dante had fallen while Bowie was "coming around to get him out" and "hit his face on the seat of the car[.]"

357. In light of the record known to Hower at the time of the preliminary hearing, Hower's gross distortion of Bowie's account of the Rutter's trip, which he presented to the court as fact, constituted a grave and material misrepresentation.

358. The evidence overwhelmingly documented Dante's serious medical issues that had persisted long before the brief time Dante had known Mullinix and Bowie.

359.   In the days leading up to the incident, Mullinix had documented neglect issues and CYF involvement, and multiple witnesses confirmed that Dante was experiencing recurring medical abnormalities that day.

360.   Against this backdrop, Hower prejudiced the investigation by materially misrepresenting the contents of footage that corroborated Bowie's account that that Dante fell inside the vehicle, as Bowie had repeatedly clarified.

361.   In making the misrepresentation, Hower concealed that Bowie's account had been independently corroborated by substantial, objective evidence, all while attempting to case substantial doubt on Bowie's credibility and honesty.

362.   Once again, Hower diverted scrutiny from Mullinix and unjustifiably and disproportionately targeted Bowie, denying to the magisterial district court a fair representation of what the extensive investigation had actually revealed.

## E.    THE CONTINUED DISSIPATION OF PROBABLE CAUSE.

363.   On December 18, 2018,  over three months after Dante had died, Hower finally retrieved Bowie's jeans from the evidence locker and swabbed the white mark appearing to be saliva or mucus.

364.   On January 3, 2019, Hower conducted another interview with Mullinix who admitted that she had delayed picking up Dante's prescription for his fungal infection and failed to administer the medication to Dante once she finally received it.

3542444v1

365. Mullinix also admitted to Hower that Dante was in a great deal of pain and conceded that there were bruises on Dante's face several days before his traumatic accident.

366. On January 3, 2019, nearly four months after the investigation began, Hower finally pursued a charge against Mullinix for endangering the welfare of children.Moreover, many of the facts Hower cited in filing his charge against Mullinix had been known to him in the early days of his investigation and before he had sworn out the Affidavit against Bowie and/or the preliminary hearing.

367. Yet Hower waited nearly four months to pursue a warrant against Mullinix, waiting until after Bowie's preliminary hearing, with Bowie all the while remaining in jail and *inter alia* facing a charge of murder of the first degree.

368. On April 25, 2019, YCPD obtained a search warrant for a Facebook page known as "Justice for Dante," a forum that had been created by Sarah Mullinix – Mullinix's sister – to document Dante's abuse before he had died.

369. On June 4, 2019, YCPD concluded that the tan mucus substance swabbed from the driver side of Bowie's vehicle was consistent with animal crackers and/or Teddy Grahams, corroborating Bowie's account that cookie had been expelled from Dante's nose while Bowie was attempting to administer life-saving treatment.

68

370. On August 17, 2020, YCPD obtained a second Justice for Dante Facebook page search warrant and inventory.

371. At this point in the investigation, the Justice for Dante Facebook page contained a number posts and screenshots suggesting one or more other than Bowie in Dante's abuse and death.

## F.    BOWIE'S DAMAGES.

372. Despite the mountain of evidence showing Dante's serious pre-existing medical condition and Mullinix's failure to address them, combined with the complete absence of motive on Bowie's part or other evidence to suggest Bowie would have desired to cause Dante's death, Bowie remained in prison for four years until trial as a result of the first-degree murder charge Hower had baselessly filed against him.

373. This time period coincided with the COVID pandemic, and during such time Bowie was denied all outside visitors for a period of fourteen months.

374. Trial began on December 5, 2022.

375. On December 30, 2022, twenty-five days after trial had begun, a jury found Bowie not guilty on all charges after deliberating for less than three hours.

376. Bowie was discharged after having been held in custody for more than four years.

377. Hower's malicious prosecution caused Bowie to incur $75,000 in legal defense costs for which he must be compensated.

378. Hower's malicious prosecution caused Bowie to suffer lost income during the more than four years he was incarcerated in at least the amount of $150,000.

379. Hower's malicious prosecution caused Bowie to suffer loss of freedom of movement during the more than four years he was incarcerated.

380. Additionally, Bowie was subjected to extreme personal humiliation, embarrassment and loss of reputation during such period for which he must be compensated.

## Count I
**Malicious Prosecution – Charges of Murder of the First Degree, Murder of the Third Degree and Endangering Welfare of Children
42 U.S.C. § 1983; U.S. Const. amend. IV
(Against Defendant Hower)**

381. Bowie incorporates by reference the allegations of the foregoing paragraphs.

382. Hower lacked probable cause to bring the charges of murder of the first degree, murder of the third degree and endangering the welfare of children against Bowie.

383. Even if probable cause had existed at the time of the filing of the charge, the same dissipated after Hower obtained extensive evidence corroborating

Bowie's account and implicating Mullinix or a third party close to her of prior abuse.

384. Hower acted with malice by commencing and maintaining the prosecution on the such charges against Bowie.

385. Bowie has suffered injuries as a result of the malicious prosecution.

WHEREFORE, Bowie demands judgment in his favor and against Defendant Hower for compensatory damages, punitive damages, attorney's fees, costs and such other relief as is just and equitable.

### Count II
**Malicious Prosecution – Charges of Murder of the First Degree, Murder of the Third Degree and Endangering Welfare of Children**
**Pennsylvania Common Law**
**(Against Defendant Hower)**

386. Bowie incorporates by reference the allegations of the foregoing paragraphs.

387. Hower lacked probable cause to bring the charges of murder of the first degree, murder of the third degree and endangering the welfare of children against Bowie.

388. Under Pennsylvania common law, a rebuttable presumption of malice arises in the absence of probable cause. *Lee v. Mihalich*, 847 F.2d 66, 69–70 n.8 (3d Cir. 1988) (citing *Hugee v. Pennsylvania R.R. Co.,* 101 A.2d 740 (Pa. 1954)).

389.   Hower acted with malice by commencing and maintaining the prosecution of the such charges against Bowie.

390.   Bowie has suffered injuries as a result of the malicious prosecution.

WHEREFORE, Bowie demands judgment in his favor and against Defendant Hower for compensatory damages, punitive damages, attorney's fees, costs and such other relief as is just and equitable.

Respectfully submitted,

**METTE, EVANS & WOODSIDE**

By: _____
Aaron D. Martin
Pa. Atty. I.D. 76441
Marisa O. Swartley, Esq.
Pa. Atty. I.D. 338223
3401 North Front Street
Harrisburg, PA 17110
(717) 232-5000
admartin@mette.com
moswartley@mette.com

*Attorneys for Plaintiff,*
*Tyree Bowie*

Date: May 1, 2026